**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: _______________________**

JOAN YAMILITH SINCLAIR,

Plaintiff,

vs.

HARDING BROTHERS (GUERNSEY) LIMITED, a Guernsey company; HARDING BROTHERS INCORPORATED, a Florida corporation; and CARNIVAL CORPORATION, a Panamanian corporation, d/b/a CARNIVAL CRUISE LINE,

Defendants.
___________________________________/

**SEAMAN'S COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, JOAN YAMILITH SINCLAIR, sues Defendants, HARDING BROTHERS (GUERNSEY) LIMITED, HARDING BROTHERS INCORPORATED, and CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE, and alleges:

**JURISDICTION, VENUE, AND PARTIES**

1. This is a civil action at law by a seaman for damages under the Jones Act, 46 U.S.C. § 30104, and the general maritime law of the United States. Plaintiff brings every claim in this Complaint at law and demands trial by jury on all counts. Plaintiff does not designate any claim in this Complaint as an admiralty or maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure.

2. This Court has subject-matter jurisdiction over the Jones Act claims under 28 U.S.C. § 1331 because those claims arise under the laws of the United States. This Court has jurisdiction over the general maritime claims for unseaworthiness, maintenance and cure, and failure to provide prompt and adequate medical care under 28 U.S.C. § 1333(1), and supplemental jurisdiction over those claims under 28 U.S.C. § 1367(a) because they form part of the same case or

controversy as the Jones Act claims. Plaintiff proceeds on all claims at law, with a jury, as the saving-to-suitors clause of 28 U.S.C. § 1333(1) permits.

3. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) and under 45 U.S.C. § 56, made applicable to Jones Act actions by 46 U.S.C. § 30104. Defendants CARNIVAL and HARDING INC. reside in this District because each maintains its principal place of business in Miami-Dade County, Florida. A substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including the decisions concerning Plaintiff's shoreside medical referrals, repatriation, medical care, maintenance, and cure, which were made by Defendants and their claims administrator, U.S. Maritime Consultants, Inc., in Miami-Dade County, Florida. Defendant HARDING GUERNSEY is not resident in the United States and may be sued in any judicial district under 28 U.S.C. § 1391(c)(3); it was also doing business in this District when this action was commenced.

4. At all times material, the Plaintiff, JOAN YAMILITH SINCLAIR ("MS. SINCLAIR"), was a Jones Act seaman and crewmember aboard the cruise ship Carnival Radiance, and is sui juris. She is a citizen of Nicaragua and resides in Managua, Nicaragua.

5. Defendant, CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE ("CARNIVAL"), is a Panamanian corporation with its principal place of business at 3655 N.W. 87th Avenue, Miami, Miami-Dade County, Florida 33178. At all times material, CARNIVAL was the owner, operator, manager, bareboat charterer, or owner pro hac vice of the Carnival Radiance, a passenger vessel of Panamanian registry, and controlled the vessel and its crew.

6. Defendant, HARDING BROTHERS INCORPORATED ("HARDING INC."), is a Florida corporation with its principal place of business at 7205 Corporate Center Drive, Suite 400, Miami, Miami-Dade County, Florida 33126. HARDING INC. is the United States operating company of the Harding retail group that operates the shops aboard the Carnival Radiance and other CARNIVAL vessels. Its chief executive officer is the chief executive officer of the Harding group. HARDING INC. is sued as Plaintiff's Jones Act employer, joint employer, or borrowing

employer, and as the United States agent of the Harding entity named in her written employment agreement.

7. Defendant, HARDING BROTHERS (GUERNSEY) LIMITED ("HARDING GUERNSEY"), is a company organized under the laws of Guernsey, Channel Islands, with a registered office at Suite 2, 4th Floor, West Wing, Trafalgar Court, Admiral Park, St Peter Port, Guernsey GY1 2JA. HARDING GUERNSEY is the entity named as employer in Plaintiff's written Seafarer Employment Agreements dated August 29, 2023 and September 13, 2023, for service aboard the Carnival Radiance. Plaintiff sues HARDING GUERNSEY in the alternative as her nominal Jones Act employer.

8. This Court has personal jurisdiction over Defendant CARNIVAL. At all times material, CARNIVAL, personally or through an agent: maintained its principal place of business in Miami-Dade County, Florida, and is at home in Florida; operated, conducted, engaged in, or carried on a business venture in Florida and maintained offices in Florida; was engaged in substantial and not isolated activity within Florida; owned and operated the Carnival Radiance and the other vessels of its fleet, which call at and sail from ports in Florida and the United States; directed Plaintiff's shipboard medical care and shoreside referrals through its shipboard medical department and its Miami crew-medical operation; and committed the acts and omissions described in this Complaint in whole or in part in Florida.

9. This Court has personal jurisdiction over Defendant HARDING INC. At all times material, HARDING INC., personally or through an agent: maintained its principal place of business in Miami-Dade County, Florida, and is at home in Florida; operated, conducted, engaged in, or carried on a business venture in Florida and maintained an office in Florida; was engaged in substantial and not isolated activity within Florida; operated and staffed retail concessions aboard CARNIVAL vessels that call at and sail from Florida ports; directed Plaintiff's medical care, repatriation, maintenance, and cure from Miami-Dade County, Florida, through the claims administrator U.S. Maritime Consultants, Inc.; and committed the acts and omissions described in this Complaint in whole or in part in Florida.

10. This Court has personal jurisdiction over Defendant HARDING GUERNSEY. HARDING GUERNSEY contracted with Plaintiff in agreements that named CARNIVAL CRUISE LINE of Miami, Florida, as the ship owner, that recite that HARDING GUERNSEY issued them "Acting as the Employer and representative of the Ship Owner," and that directed Plaintiff to work in Harding shops aboard CARNIVAL vessels operated from Florida. HARDING GUERNSEY conducts its staffing business for those shops through and with HARDING INC. at its United States regional hub in Miami, Florida, and the medical care, maintenance, and cure owed to Plaintiff were administered from Miami-Dade County, Florida, by U.S. Maritime Consultants, Inc. HARDING GUERNSEY has therefore purposefully directed its activities at Florida, and Plaintiff's claims arise from those activities. Fla. Stat. § 48.193(1)(a)1., (2); Fed. R. Civ. P. 4(k)(1)(A). In the alternative, because Plaintiff's Jones Act claims arise under federal law and HARDING GUERNSEY is not subject to the general jurisdiction of the courts of any single State, HARDING GUERNSEY is subject to personal jurisdiction in this Court under Rule 4(k)(2) of the Federal Rules of Civil Procedure based on its contacts with the United States as a whole.

**THE EMPLOYMENT RELATIONSHIP**

11. On August 28, 2023, MS. SINCLAIR joined the Carnival Radiance at Los Angeles, California, to work in the retail shops aboard the vessel. Her written Seafarer Employment Agreement dated August 29, 2023, names Harding Guernsey as "the Company," assigns her the position of Trainee Assistant Manager, states a salary of $225.00 per week, identifies the ship as Carnival Radiance, the ship's flag as Panama, and the ship owner as "Carnival Cruise Line a division of Carnival Corporation, 3655 NW 87th Avenue, Florida, Miami, 33178, United States," and recites that it "meets the requirements of Regulation 2.1 and Standard A2.1 of the Maritime Labour Convention, 2006." A superseding agreement dated September 13, 2023, reassigned her to the position of Sales Associate aboard the same vessel through November 17, 2023, on the same terms. True copies of both agreements are attached as Composite Exhibit A.

12. Each agreement recites that it was "entered into onboard the Carnival Radiance," and the signature line for the company is blank on each. The cover letter transmitting each agreement, on Harding Guernsey letterhead, told MS. SINCLAIR that she would be "working on board a ship in one of the shops operated by Harding Brothers Retail Limited" and that she needed to sign the agreement "[i]n order to become formally employed by Harding Brothers (Guernsey) Limited." Each agreement provides that her salary is paid "monthly in arrears on the 6th working day (working days are Monday to Friday and exclude UK Bank Holidays) of each month via a pre-paid Visa or Mastercard."

13. The ship and company data published through Equasis identify CARNIVAL CORPORATION, 3655 N.W. 87th Avenue, Doral, Florida, as the registered owner, ISM manager, and commercial manager of the Carnival Radiance (IMO 9172648) at all times material.

14. At all times material, CARNIVAL was the owner, operator, manager, bareboat charterer, or owner pro hac vice of the Carnival Radiance, which in September, October, and November 2023 sailed from Long Beach, California, on three- and four-night voyages to Catalina Island and Ensenada, Mexico.

15. At all times material, the shops aboard the Carnival Radiance were located on CARNIVAL's vessel, stocked from CARNIVAL's storerooms, and operated during hours and under rules set by CARNIVAL for the service of CARNIVAL's passengers.

16. Once aboard the Carnival Radiance, MS. SINCLAIR lived aboard the vessel in crew quarters CARNIVAL assigned, ate in CARNIVAL's crew mess, held a CARNIVAL crew identification card, was subject to the authority of the Master and of CARNIVAL's officers and Human Resources Manager, took part in CARNIVAL's safety drills and musters, worked in CARNIVAL's storerooms and shops, moved CARNIVAL's passengers' merchandise through CARNIVAL's passageways and stairways, and depended on CARNIVAL's medical center for her medical care. Her work was the work of the vessel: serving CARNIVAL's passengers aboard CARNIVAL's ship.

17. MS. SINCLAIR sues each Defendant as her Jones Act employer, borrowing employer, or dual employer in the alternative. A seaman "must speculate at his peril" about which entity will ultimately be deemed her Jones Act employer only if the law so required, and it does not; she may sue "both employers in the alternative," and "[t]he defendants can sort out which between them will bear the final cost of recovery." *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 225–26 (5th Cir. 1975), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc). The Defendants' "status and liability inter se is not the injured seaman's concern." *Id.* at 225–26. A seaman may have more than one Jones Act employer. *Guidry v. South Louisiana Contractors, Inc.*, 614 F.2d 447, 452 (5th Cir. 1980).

18. Whether a seaman has become the borrowed servant of a second employer turns on which entity controlled the work, whose work was being performed, the agreement or understanding between the employers, who furnished the place and instruments of the work, the duration of the arrangement, and the right to discharge and the obligation to pay. *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969). Under those factors, once aboard the Carnival Radiance MS. SINCLAIR became the borrowed servant of CARNIVAL.

19. CARNIVAL controlled MS. SINCLAIR's work. On information and belief, the Harding Shop Manager aboard, Vane Mukoski, reported to and took direction from CARNIVAL's Hotel Director on the hours the shops opened and closed, the days and hours on which stock could be moved through the vessel, the embarkation-day and port-day duties of shop staff, and the conduct of shop staff aboard. CARNIVAL's officers had authority to discipline MS. SINCLAIR, to confine her to the vessel, and to remove her from the vessel. CARNIVAL's Human Resources Manager, Kim Keighron, received and acted on MS. SINCLAIR's complaints about her manager. CARNIVAL's medical center determined when MS. SINCLAIR was fit for duty, what she could lift, and whether and when she would be sent ashore.

20. MS. SINCLAIR performed CARNIVAL's work. The shops exist to serve CARNIVAL's passengers aboard CARNIVAL's ship as part of the cruise product CARNIVAL sells, and CARNIVAL shares in the revenue of the shops.

21. CARNIVAL furnished the place and instruments of the work: the shops on Deck 5, the storeroom on Deck 0, the shelving, bins, stairways, and passageways, the crew cabin, the crew mess, and the medical center.

22. The arrangement was of long duration: the Harding group has operated shops aboard CARNIVAL vessels under contract since 2016, and MS. SINCLAIR worked aboard CARNIVAL's vessel for the full term of her contract.

23. In the alternative, MS. SINCLAIR was the borrowed servant or employee of HARDING INC. The Harding group describes its Miami office as its "US Regional Hub" and lists no office in Guernsey. Harding Guernsey's registered address is a suite in a multi-tenant office building in St Peter Port. On information and belief, Harding Guernsey has no employees, recruiters, schedulers, or managers of its own; the Harding group recruits shipboard staff online and through local recruitment partners, and its onboarding, scheduling, and area management of shop staff aboard CARNIVAL vessels sailing from United States ports are performed from the Miami hub by HARDING INC. MS. SINCLAIR's November 17, 2023 performance appraisal aboard the Carnival Radiance was prepared on a form directing the Shop Manager to "always send signed copy to your Area Manager & Scheduler." Her repatriation flight and the medical and transportation payments later made for her were paid and administered from Miami-Dade County through U.S. Maritime Consultants, Inc., which identified its principals as "HB." On information and belief, HARDING INC. scheduled, supervised, evaluated, and paid Harding shop staff aboard CARNIVAL vessels from its Miami office, directed the shop managers aboard those vessels, and administered the medical care, maintenance, and cure of injured shop staff.

24. Harding Guernsey is a nominal employing entity interposed between MS. SINCLAIR and the companies that recruited, directed, paid, and supervised her. Its contract with MS. SINCLAIR was issued and countersigned by no one, recites a place of signing in Guernsey for an agreement entered into aboard a vessel at Los Angeles, and keys her pay dates to United Kingdom bank holidays.

25. In the further alternative, and only if the trier of fact finds that MS. SINCLAIR was not the borrowed servant of CARNIVAL or HARDING INC., HARDING GUERNSEY was her Jones Act employer. HARDING GUERNSEY is the entity named as employer in her written agreements and held itself out to her as her employer. A Jones Act employer's duties are nondelegable, and HARDING GUERNSEY remains liable for their breach whether the breach was committed by HARDING GUERNSEY directly or by CARNIVAL or HARDING INC. acting in its stead.

26. Under the general maritime law, each Defendant that was MS. SINCLAIR's employer owed her all the duties and benefits of a maritime employer, including the duty to provide prompt, proper, and adequate medical care and the duty to provide maintenance and cure until she reaches maximum medical cure. *Garay v. Carnival Cruise Line, Inc.*, 904 F.2d 1527, 1530, 1533 (11th Cir. 1990); *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730 (1943).

27. CARNIVAL, as the owner and operator of the Carnival Radiance, also owed MS. SINCLAIR, a seaman serving aboard its vessel, the absolute duty to provide a seaworthy vessel, a duty that is "neither limited by conceptions of negligence nor contractual in character." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960).

28. CARNIVAL also owed MS. SINCLAIR maintenance and cure as the registered owner, manager, and operator of the Carnival Radiance, the vessel in whose service she was injured and for whose benefit she worked. The maintenance-and-cure obligation is "anciently imposed upon a shipowner for the health and security of sailors" and is "an implied provision in contracts of marine employment." *Aguilar*, 318 U.S. at 730.

**THE INJURIES AND THE DENIAL OF CARE**

29. MS. SINCLAIR's shipboard duties included staffing the retail shops on Deck 5, moving merchandise between the Deck 0 storeroom and the shops, setting up and breaking down promotional tables and displays, and lifting and carrying stacks of stock, work that required repeated heavy lifting on embarkation and port days.

30. On October 3, 2023, during her lunch break, MS. SINCLAIR went to the vessel's medical center. She was admitted for about four hours with heavy vaginal bleeding that soaked a pad every hour and cramping lower abdominal pain rated 7 out of 10 that radiated to her lower back. She was given intravenous Paracetamol and intramuscular Ketorolac and referred shoreside for an urgent gynecological consultation.

31. On October 3 and 4, 2023, MS. SINCLAIR was examined shoreside in Ensenada, Mexico. An ultrasound showed uterine leiomyomatosis with a uterus measuring 14.43 by 10.65 centimeters. The treating physician reported that the condition required definitive management by hysterectomy, that MS. SINCLAIR was fit to travel but had not reached maximum medical improvement, and that she was restricted from lifting more than 15 kilograms. The ship's physician, Sithembele Malgas, M.D., recorded that MS. SINCLAIR was to be scheduled for a hysterectomy.

32. MS. SINCLAIR was not disembarked for treatment. She was returned to the shops under the 15-kilogram lifting restriction and kept aboard and at work for six more weeks. The Shop Manager, Vane Mukoski, told MS. SINCLAIR that her lifting restriction was unfair to him and to her coworkers and continued to assign her work that required lifting stock and promotional tables in excess of the restriction.

33. On October 5, 2023, at about 9:30 p.m., while retrieving merchandise from the third shelf of the Deck 0 storeroom as the vessel maneuvered, MS. SINCLAIR fell from the shelving onto hard plastic storage bins stacked on the deck and struck her back, hip, and left leg. A crewmember from the engine department named Jorge found her, helped her up, and carried the merchandise up the stairs to the shop for her. Her cabin mate, Nicole Hamilton, learned of the fall that night.

34. The storeroom was unsafe for the work MS. SINCLAIR was assigned. Stock was stowed on high shelving that required crewmembers to climb to reach it; the deck was obstructed by stacked plastic bins; no step stool, ladder, fall protection, or second crewmember was provided;

and a crewmember under a known lifting restriction was sent to retrieve stock alone at night while the vessel was underway.

35. MS. SINCLAIR reported the fall and her pain to Mukoski that same night. Mukoski laughed at her, made no accident report, and did not refer her to the medical center. No Defendant investigated the fall or arranged any medical evaluation of it.

36. From October 5 through November 17, 2023, MS. SINCLAIR continued to complain of back and leg pain and of her bleeding. Mukoski denied her access to the medical center during working hours and refused requests from the medical center's nurses to release her for follow-up. MS. SINCLAIR also reported her condition to the Assistant Shop Manager, Sonia Mostert, who took no action, and complained to CARNIVAL's Human Resources Manager, Kim Keighron, on three occasions between October 5 and November 11, 2023. Dr. Malgas also reported Mukoski's interference with MS. SINCLAIR's medical care to Human Resources. Neither CARNIVAL's Human Resources department nor the Harding shop management took effective action.

37. On November 14, 2023, Dr. Malgas saw MS. SINCLAIR for follow-up, confirmed the diagnosis of a large-element uterine leiomyoma, noted that a hysterectomy was to be scheduled once she was home, and continued the 15-kilogram lifting restriction. MS. SINCLAIR disembarked at the end of her contract on November 17, 2023, and flew home to Nicaragua on November 18, 2023.

38. In Managua, MS. SINCLAIR came under the care of gynecologist Martha Montenegro Larios, M.D., at Hospital Vivian Pellas, who on November 29, 2023, diagnosed abnormal uterine bleeding from multiple uterine myomatosis with secondary iron-deficiency anemia and pelvic pain. On December 12, 2023, MS. SINCLAIR underwent a total abdominal hysterectomy with blood transfusion. Her recovery was complicated by a surgical-site hematoma that required drainage, elevated blood pressure that required medication, and persistent pain and numbness in the left thigh and groin.

39. Mammography ordered before the hysterectomy showed a BIRADS 4A lesion in the right breast. MS. SINCLAIR underwent an ultrasound-guided core biopsy on January 5, 2024, and an open tumorectomy of the right breast on January 26, 2024. The pathology was benign. She continues to suffer pain in the breast and chest wall, for which her mastologist, Veronica Aviles, M.D., has diagnosed intercostal neuropathy and has recommended an ultrasound-guided intercostal nerve infiltration and neuromodulators. No Defendant has authorized or provided that treatment.

40. Beginning March 5, 2024, MS. SINCLAIR was treated by orthopedist Dino Aguilar, M.D., for low back pain, left anterior thigh pain and numbness, and bilateral knee pain. Electrodiagnostic studies on March 12, 2024, were consistent with neuropraxia of the left lateral femoral cutaneous nerve. X-rays on March 14, 2024, showed narrowing at L5-S1 and a transitional L5 vertebra. An MRI of the lumbosacral spine on April 24, 2024, showed facet synovitis at L2-L3, L3-L4, and L4-L5, diffuse disc bulging, and a posterior annular tear at L4-L5 that indented the dural sac and contacted the nerve roots.

41. On May 28, 2024, spine surgeon Zeyra Lopez Aguilar, M.D., recorded eight months of low back pain radiating to both sacroiliac joints with cramping, tingling, and hypersensitivity in the thigh, diagnosed degenerative disc disease at L5-S1 and multilevel facet syndrome, prescribed medication and a therapy program, and recorded that an epidural block would be considered if MS. SINCLAIR did not improve. MS. SINCLAIR completed 30 sessions of physical therapy between August 6 and September 25, 2024, with her pain unchanged. On November 26, 2024, Dr. Lopez Aguilar continued treatment, prescribed a lumbar brace, and did not discharge her. MS. SINCLAIR continues to suffer low back pain, left lower-extremity symptoms, and functional limitation.

42. HARDING GUERNSEY and HARDING INC. (together, the "Harding Defendants"), acting through their claims administrator, U.S. Maritime Consultants, Inc., of Miami, Florida, obtained reports declaring MS. SINCLAIR at maximum medical improvement from internal medicine on February 19 and October 24, 2024, from gynecology on February 29 and

April 3, 2024, from otolaryngology on September 20, 2024, and from orthopedics on November 4, 2024. No spine surgeon, mastologist, or pain-management physician has declared her at maximum medical improvement. Her treating spine surgeon and mastologist have recommended further treatment that the Harding Defendants have not provided.

43. The Harding Defendants paid MS. SINCLAIR's medical providers in Nicaragua $23,852.33 and paid transport costs of $5,934.70 through January 16, 2025, according to their own accounting. The Harding Defendants paid MS. SINCLAIR sick wages through March 6, 2024, and a single further payment of $353.96 on July 5, 2024. The Harding Defendants have paid no maintenance for her food and lodging ashore from November 18, 2023, to the present, have paid no wages since July 5, 2024, and have paid nothing toward the treatment her spine surgeon and mastologist have recommended.

44. CARNIVAL, whose medical center diagnosed MS. SINCLAIR's uterine condition on October 3, 2023, imposed her lifting restriction, and recorded on November 14, 2023 that she required a hysterectomy once home, has at no time paid or provided any maintenance, cure, or unearned wages to MS. SINCLAIR, has arranged no medical evaluation or treatment for her since she left its vessel, and has made no inquiry into her condition or her entitlement to those benefits.

45. On April 11, 2025, MS. SINCLAIR's counsel sent Defendants a letter of representation requesting her medical and personnel records and demanding maintenance and cure. On May 8, 2025, the Harding Defendants' claims administrator responded that the shipboard records "do not reflect your client reported any injuries while onboard," asked counsel to identify eyewitnesses, and stated that benefits had ended because MS. SINCLAIR had been declared at maximum medical improvement. The Harding Defendants did not interview MS. SINCLAIR, Mukoski, Mostert, Keighron, Nicole Hamilton, or the engine-department crewmember who assisted her, did not request records from her treating spine surgeon or mastologist, and did not reinstate any benefit.

**COUNT I**
**CARNIVAL's Jones Act Negligence: Assignment of Work in Violation of Medical Restriction (October 3 through November 17, 2023)**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

46. Defendant, CARNIVAL, as MS. SINCLAIR's borrowing Jones Act employer, owed her the duty to assign her only work that she was physically able to perform safely and to honor the medical restrictions placed on her.

47. From October 3, 2023, through her disembarkation on November 17, 2023, MS. SINCLAIR was injured as a direct and proximate result of CARNIVAL's breach of that duty, directly and through its agents and employees, in that it:

a. After October 3, 2023, assigned MS. SINCLAIR work that required lifting stock and promotional tables in excess of the 15-kilogram restriction imposed by her physicians, including the stock retrieval during which she fell on October 5, 2023;

b. Through the Shop Manager, told MS. SINCLAIR that her restriction was unfair to him and to her coworkers and pressed her to work through it;

c. Kept MS. SINCLAIR working aboard for six weeks after her physicians determined on October 3 and 4, 2023, that she required a hysterectomy and had not reached maximum medical improvement; and

d. Other acts and omissions of the same kind that will be found in discovery and proven at trial.

48. Defendant, CARNIVAL, knew or should have known of the foregoing conditions and had the opportunity to correct it.

49. CARNIVAL's negligence played a part, however slight, in producing MS. SINCLAIR's injuries, including six further weeks of hemorrhage, anemia, and pain before her surgery, the aggravation of her uterine condition, her fall of October 5, 2023, and the strain on her lumbar spine from lifting beyond her restriction.

50. As a direct and proximate result of the negligence of the Defendant, its agents, and its employees, MS. SINCLAIR suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization and of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of previously existing conditions. The losses are permanent or continuing, and she will suffer them in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, CARNIVAL, for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

**COUNT II**
**CARNIVAL's Jones Act Negligence: Unsafe Condition of the Deck 0 Storeroom (October 5, 2023)**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

51. Defendant, CARNIVAL, as MS. SINCLAIR's borrowing Jones Act employer, owed her the duty to provide her a reasonably safe place to work, including storerooms, shelving, and equipment reasonably safe for the retrieval of stock.

52. On or about October 5, 2023, MS. SINCLAIR was injured as a direct and proximate result of CARNIVAL's breach of that duty, directly and through its agents and employees, in that the Deck 0 storeroom in which she was required to work:

a. Was fitted with high shelving that required crewmembers to climb the shelving itself to retrieve stock stowed on the upper shelves;

b. Had no ladder, step stool, or fall protection for reaching the upper shelves;

c. Had its deck obstructed by hard plastic storage bins stacked at the base of the shelving, onto which a crewmember who lost her footing would fall;

d. Was stocked so that heavy and frequently needed merchandise sat on the upper shelves rather than at or below shoulder height; and

e. Had other unsafe conditions that will be found in discovery and proven at trial.

53. Defendant, CARNIVAL, knew or should have known of the foregoing conditions and had the opportunity to correct it.

54. CARNIVAL's negligence played a part, however slight, in producing MS. SINCLAIR's fall and her resulting lumbar spine injury, including the annular tear at L4-L5 and facet injury, her left lower-extremity nerve injury, and her knee and hip pain.

55. As a direct and proximate result of the negligence of the Defendant, its agents, and its employees, MS. SINCLAIR suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization and of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of previously existing conditions. The losses are permanent or continuing, and she will suffer them in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, CARNIVAL, for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

## COUNT III
## CARNIVAL's Jones Act Negligence: Unsafe Method of Work in the Storeroom (October 5, 2023)

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

56. Defendant, CARNIVAL, as MS. SINCLAIR's borrowing Jones Act employer, owed her the duty to adopt and enforce reasonably safe methods of work and to furnish adequate staffing and assistance for the tasks she was assigned.

57. On or about October 5, 2023, MS. SINCLAIR was injured as a direct and proximate result of CARNIVAL's breach of that duty, directly and through its agents and employees, in that it:

a. Sent MS. SINCLAIR, a crewmember under a known 15-kilogram lifting restriction, to retrieve stock from the upper shelves alone, at about 9:30 p.m., while the vessel was underway and maneuvering;

b. Provided no second crewmember to steady the shelving, hand down stock, or assist her;

c. Had no procedure requiring that stock be retrieved from the upper shelves by two crewmembers, with a ladder, or while the vessel was in port;

d. Scheduled the shop department so short-handed that a crewmember under a lifting restriction performed stock retrieval alone; and

e. Other acts and omissions of the same kind that will be found in discovery and proven at trial.

58. Defendant, CARNIVAL, knew or should have known of the foregoing methods of work and had the opportunity to correct it.

59. CARNIVAL's negligence played a part, however slight, in producing MS. SINCLAIR's fall and her resulting lumbar spine injury, left lower-extremity nerve injury, and knee and hip pain.

60. As a direct and proximate result of the negligence of the Defendant, its agents, and its employees, MS. SINCLAIR suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization and of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of previously existing conditions. The losses are permanent or continuing, and she will suffer them in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, CARNIVAL, for all damages allowed under the general maritime law, including

compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

**COUNT IV**
**CARNIVAL's Unseaworthiness**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

61. Defendant, CARNIVAL, as the owner and operator of the Carnival Radiance, owed MS. SINCLAIR, a seaman serving aboard the vessel, the absolute duty to provide a seaworthy vessel, which includes the duty to furnish a vessel, appurtenances, and crew reasonably fit for their intended use. The duty is "neither limited by conceptions of negligence nor contractual in character" and extends to a temporary unseaworthy condition. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549–50 (1960).

62. On or about October 5, 2023, and from October 3 through November 17, 2023, MS. SINCLAIR was injured as a direct and proximate result of CARNIVAL's breach of its duty to provide a seaworthy vessel. The Carnival Radiance was unseaworthy in the following respects:

a. The Deck 0 storeroom was fitted with high shelving that required crewmembers to climb to retrieve stock, with no ladder, step, or fall protection;

b. The storeroom deck was obstructed by stacked hard plastic bins;

c. The method of stowing and retrieving stock, by a lone crewmember climbing the shelving at night while the vessel was underway, was an unsafe method of operation;

d. The shop department was shorthanded, so that a crewmember under a lifting restriction worked alone and performed lifting beyond her restriction;

e. The vessel did not have a fit crew, in that the shop management aboard denied a crewmember under medical restriction access to the medical center after October 5,

2023, ignored her lifting restriction, refused the medical center's requests for her release, and failed to report her fall;

f. The vessel's procedures for crew access to medical care and for the reporting and investigation of crew injuries were inadequate or were not followed; and

g. Other conditions of unseaworthiness that will be found in discovery and proven at trial.

63. As a direct and proximate result of the unseaworthiness of the vessel, MS. SINCLAIR suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization and of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of previously existing conditions. The losses are permanent or continuing, and she will suffer them in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, CARNIVAL, for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

## COUNT V
## Failure to Provide Prompt, Proper, and Adequate Medical Care Against CARNIVAL

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

64. Under the Jones Act and the general maritime law, Defendant, CARNIVAL, as MS. SINCLAIR's borrowing Jones Act employer, owed the duty to provide prompt, proper, and adequate medical care to seamen who fall ill or suffer injury in the service of the vessel, and is liable for the negligence of the shipboard and shoreside medical providers to whom it entrusted her care. *De Zon v. American President Lines, Ltd.*, 318 U.S. 660, 667–69 (1943); *Central Gulf Steamship Corp. v. Sambula*, 405 F.2d 291, 301–02 (5th Cir. 1968).

65. The negligent failure to provide prompt medical care to an ill or injured seaman is actionable under the Jones Act as a claim separate from the claim for the injuring event and from the claim for maintenance and cure. *Cortes v. Baltimore Insular Line, Inc.*, 287 U.S. 367, 371–72, 375–76 (1932); *Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 684–85 (10th Cir. 1981).

66. Defendant, CARNIVAL, negligently failed to provide MS. SINCLAIR with prompt, proper, adequate, and complete medical care, in that it:

a. Kept her aboard and at work for six weeks after her physicians determined on October 3 and 4, 2023, that she required a hysterectomy and had not reached maximum medical improvement, instead of disembarking her for the surgery;

b. Denied her access to the vessel's medical center during working hours from October 5 through November 17, 2023, and refused the medical center's requests for her release for follow-up;

c. Arranged no medical evaluation of her October 5, 2023 fall or of the back and leg pain she reported afterward;

d. Arranged no orthopedic or spine evaluation of the back and leg injuries she reported aboard, before or after her disembarkation, so that her lumbar injury went undiagnosed until March 2024;

e. Provided none of the treatment her treating spine surgeon and mastologist have recommended; and

f. Other acts and omissions that will be found in discovery and proven at trial.

67. As a direct and proximate result of CARNIVAL's failure to provide prompt, proper, and adequate medical care, MS. SINCLAIR suffered six further weeks of hemorrhage, anemia, and pain before her surgery, unrelieved pain, delay in the diagnosis and treatment of her spinal injury, aggravation of her underlying injuries, and a prolonged recovery, together with physical pain and suffering, mental anguish, loss of enjoyment of life, disability, additional medical expenses, lost wages, and impaired earning capacity. The injuries are permanent or continuing, and she will suffer these losses in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, CARNIVAL, for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

**COUNT VI**
**Maintenance and Cure Against CARNIVAL as Borrowing Employer**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

68. Defendant, CARNIVAL, as MS. SINCLAIR's borrowing Jones Act employer, owes MS. SINCLAIR maintenance and cure for illness and injury that arose or manifested while she was in the service of the vessel, without regard to fault, until she reaches maximum medical cure. *Garay v. Carnival Cruise Line, Inc.*, 904 F.2d 1527, 1530, 1533 (11th Cir. 1990); *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730 (1943). The obligation "has few exceptions or conditions to stir contentions, cause delays, and invite litigations," and it continues until the seaman's incapacity is declared to be permanent. *Vella v. Ford Motor Co.*, 421 U.S. 1, 4–5 (1975). Ambiguities or doubts are resolved in favor of the seaman. *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962). The obligation extends to a seaman "whose condition becomes aggravated or enhanced for any reason, at least until the time that the seaman has achieved maximum medical recovery," and a seaman who has not reached maximum medical recovery "is still in the service of the ship and thus entitled to maintenance and cure for the additional injuries incurred." *Duarte v. Royal Caribbean Cruises, Ltd.*, 761 So. 2d 367, 368 (Fla. 3d DCA 2000).

69. MS. SINCLAIR's uterine condition, as diagnosed aboard on October 3, 2023, and her anemia, pelvic pain, lumbar spine injury, left lower-extremity nerve injury, knee and hip pain, and chest-wall pain arose, manifested, or were aggravated while she was in the service of the Carnival Radiance and before she reached maximum medical recovery for any of them. She has not reached maximum medical cure for her lumbar spine, lower-extremity, or chest-wall conditions.

Her treating spine surgeon has prescribed continuing treatment and a lumbar brace and has identified an epidural block as the next step; her mastologist has recommended an ultrasound-guided intercostal nerve infiltration and neuromodulators.

70. Defendant, CARNIVAL, has breached its obligation by: (a) paying no maintenance at any time from November 18, 2023, to the present; (b) paying no unearned wages at any time, although the general maritime law entitles MS. SINCLAIR to unearned wages through the end of her contract period; (c) providing no cure at any time, and arranging no evaluation or treatment of the lumbar spine, lower-extremity, and chest-wall conditions that arose in its service, although its own medical center documented her condition and her need for surgery; and (d) making no inquiry into her condition or her entitlement to maintenance and cure after she left its vessel.

71. As a result of CARNIVAL's failure to provide maintenance and cure, MS. SINCLAIR has suffered the aggravation and prolongation of her injuries, physical pain and suffering, mental anguish, loss of enjoyment of life, disability, medical expenses in the past and future, loss of found, and lost wages and earning capacity. The injuries are permanent or continuing, and she will suffer these losses in the future.

72. MS. SINCLAIR has retained an attorney to enforce her maintenance-and-cure rights and is entitled to recover her attorney's fees incurred in obtaining those benefits. *Vaughan*, 369 U.S. at 530–31.

73. CARNIVAL's failure to provide maintenance and cure was not the product of a reasonable investigation or a good-faith dispute. Its medical center diagnosed MS. SINCLAIR's condition, restricted her work, and recorded her need for surgery; CARNIVAL then disembarked her at the end of her contract and provided nothing, inquired into nothing, and left the seaman who had served aboard its vessel to the devices of a concessionaire's claims administrator. Its conduct was willful*Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 424 (2009).

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, CARNIVAL, for maintenance, cure, and unearned wages; compensatory damages for the failure to provide maintenance and cure and for the aggravation of her injuries caused by that

failure; punitive damages for the willful, wanton, and arbitrary failure to provide maintenance and cure; attorney's fees incurred in obtaining maintenance and cure; court costs, interest, and prejudgment interest; and demands trial by jury of all issues so triable.

**COUNT VII**
**Maintenance and Cure Against CARNIVAL as Shipowner**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

74. Defendant, CARNIVAL, as the registered owner, manager, and operator of the Carnival Radiance, the vessel in whose service MS. SINCLAIR was injured and for whose benefit she worked, owes MS. SINCLAIR maintenance and cure for illness and injury that arose or manifested while she was in the service of the vessel, without regard to fault, until she reaches maximum medical cure. *Garay v. Carnival Cruise Line, Inc.*, 904 F.2d 1527, 1530, 1533 (11th Cir. 1990); *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730 (1943). The obligation "has few exceptions or conditions to stir contentions, cause delays, and invite litigations," and it continues until the seaman's incapacity is declared to be permanent. *Vella v. Ford Motor Co.*, 421 U.S. 1, 4–5 (1975). Ambiguities or doubts are resolved in favor of the seaman. *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962). The obligation extends to a seaman "whose condition becomes aggravated or enhanced for any reason, at least until the time that the seaman has achieved maximum medical recovery," and a seaman who has not reached maximum medical recovery "is still in the service of the ship and thus entitled to maintenance and cure for the additional injuries incurred." *Duarte v. Royal Caribbean Cruises, Ltd.*, 761 So. 2d 367, 368 (Fla. 3d DCA 2000).

75. MS. SINCLAIR's uterine condition, as diagnosed aboard on October 3, 2023, and her anemia, pelvic pain, lumbar spine injury, left lower-extremity nerve injury, knee and hip pain, and chest-wall pain arose, manifested, or were aggravated while she was in the service of the Carnival Radiance and before she reached maximum medical recovery for any of them. She has not reached maximum medical cure for her lumbar spine, lower-extremity, or chest-wall conditions.

Her treating spine surgeon has prescribed continuing treatment and a lumbar brace and has identified an epidural block as the next step; her mastologist has recommended an ultrasound-guided intercostal nerve infiltration and neuromodulators.

76. Defendant, CARNIVAL, has breached its obligation by: (a) paying no maintenance at any time from November 18, 2023, to the present; (b) paying no unearned wages at any time, although the general maritime law entitles MS. SINCLAIR to unearned wages through the end of her contract period; (c) providing no cure at any time, and arranging no evaluation or treatment of the lumbar spine, lower-extremity, and chest-wall conditions that arose in its service, although its own medical center documented her condition and her need for surgery; and (d) making no inquiry into her condition or her entitlement to maintenance and cure after she left its vessel.

77. As a result of CARNIVAL's failure to provide maintenance and cure, MS. SINCLAIR has suffered the aggravation and prolongation of her injuries, physical pain and suffering, mental anguish, loss of enjoyment of life, disability, medical expenses in the past and future, loss of found, and lost wages and earning capacity. The injuries are permanent or continuing, and she will suffer these losses in the future.

78. MS. SINCLAIR has retained an attorney to enforce her maintenance-and-cure rights and is entitled to recover her attorney's fees incurred in obtaining those benefits. *Vaughan*, 369 U.S. at 530–31.

79. CARNIVAL's failure to provide maintenance and cure was not the product of a reasonable investigation or a good-faith dispute. Its medical center diagnosed MS. SINCLAIR's condition, restricted her work, and recorded her need for surgery; CARNIVAL then disembarked her at the end of her contract and provided nothing, inquired into nothing, and left the seaman who had served aboard its vessel to the devices of a concessionaire's claims administrator. Its conduct was willful*Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 424 (2009).

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, CARNIVAL, for maintenance, cure, and unearned wages; compensatory damages for the failure to provide maintenance and cure and for the aggravation of her injuries caused by that

failure; punitive damages for the willful, wanton, and arbitrary failure to provide maintenance and cure; attorney's fees incurred in obtaining maintenance and cure; court costs, interest, and prejudgment interest; and demands trial by jury of all issues so triable.

**COUNT VIII**
**HARDING INC.'s Jones Act Negligence: Assignment of Work in Violation of Medical Restriction (October 3 through November 17, 2023)**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

80. This Count is pleaded in the alternative to the Counts against CARNIVAL and applies if the trier of fact finds that HARDING INC. was MS. SINCLAIR's Jones Act employer, joint employer, or borrowing employer.

81. Defendant, HARDING INC., as MS. SINCLAIR's Jones Act employer, joint employer, or borrowing employer, owed her the duty to assign her only work that she was physically able to perform safely and to honor the medical restrictions placed on her.

82. From October 3, 2023, through her disembarkation on November 17, 2023, MS. SINCLAIR was injured as a direct and proximate result of HARDING INC.'s breach of that duty, directly and through its agents and employees, in that it:

a. After October 3, 2023, assigned MS. SINCLAIR work that required lifting stock and promotional tables in excess of the 15-kilogram restriction imposed by her physicians, including the stock retrieval during which she fell on October 5, 2023;
b. Through the Shop Manager, told MS. SINCLAIR that her restriction was unfair to him and to her coworkers and pressed her to work through it;
c. Kept MS. SINCLAIR working aboard for six weeks after her physicians determined on October 3 and 4, 2023, that she required a hysterectomy and had not reached maximum medical improvement; and

d. Other acts and omissions of the same kind that will be found in discovery and proven at trial.

83. Defendant, HARDING INC., knew or should have known of the foregoing conditions and had the opportunity to correct it.

84. HARDING INC.'s negligence played a part, however slight, in producing MS. SINCLAIR's injuries, including six further weeks of hemorrhage, anemia, and pain before her surgery, the aggravation of her uterine condition, her fall of October 5, 2023, and the strain on her lumbar spine from lifting beyond her restriction.

85. As a direct and proximate result of the negligence of the Defendant, its agents, and its employees, MS. SINCLAIR suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization and of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of previously existing conditions. The losses are permanent or continuing, and she will suffer them in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, HARDING INC., for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

**COUNT IX**
**HARDING INC.'s Jones Act Negligence: Unsafe Condition of the Deck 0 Storeroom (October 5, 2023)**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

86. This Count is pleaded in the alternative to the Counts against CARNIVAL and applies if the trier of fact finds that HARDING INC. was MS. SINCLAIR's Jones Act employer, joint employer, or borrowing employer.

87. Defendant, HARDING INC., as MS. SINCLAIR's Jones Act employer, joint employer, or borrowing employer, owed her the duty to provide her a reasonably safe place to work, including storerooms, shelving, and equipment reasonably safe for the retrieval of stock.

88. On or about October 5, 2023, MS. SINCLAIR was injured as a direct and proximate result of HARDING INC.'s breach of that duty, directly and through its agents and employees, in that the Deck 0 storeroom in which she was required to work:

a. Was fitted with high shelving that required crewmembers to climb the shelving itself to retrieve stock stowed on the upper shelves;

b. Had no ladder, step stool, or fall protection for reaching the upper shelves;

c. Had its deck obstructed by hard plastic storage bins stacked at the base of the shelving, onto which a crewmember who lost her footing would fall;

d. Was stocked so that heavy and frequently needed merchandise sat on the upper shelves rather than at or below shoulder height; and

e. Had other unsafe conditions that will be found in discovery and proven at trial.

89. Defendant, HARDING INC., knew or should have known of the foregoing conditions and had the opportunity to correct it.

90. HARDING INC.'s negligence played a part, however slight, in producing MS. SINCLAIR's fall and her resulting lumbar spine injury, including the annular tear at L4-L5 and facet injury, her left lower-extremity nerve injury, and her knee and hip pain.

91. As a direct and proximate result of the negligence of the Defendant, its agents, and its employees, MS. SINCLAIR suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization and of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of previously existing conditions. The losses are permanent or continuing, and she will suffer them in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, HARDING INC., for all damages allowed under the general maritime law, including

compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

**COUNT X**
**HARDING INC.'s Jones Act Negligence: Unsafe Method of Work in the Storeroom**
**(October 5, 2023)**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

92. This Count is pleaded in the alternative to the Counts against CARNIVAL and applies if the trier of fact finds that HARDING INC. was MS. SINCLAIR's Jones Act employer, joint employer, or borrowing employer.

93. Defendant, HARDING INC., as MS. SINCLAIR's Jones Act employer, joint employer, or borrowing employer, owed her the duty to adopt and enforce reasonably safe methods of work and to furnish adequate staffing and assistance for the tasks she was assigned.

94. On or about October 5, 2023, MS. SINCLAIR was injured as a direct and proximate result of HARDING INC.'s breach of that duty, directly and through its agents and employees, in that it:

a. Sent MS. SINCLAIR, a crewmember under a known 15-kilogram lifting restriction, to retrieve stock from the upper shelves alone, at about 9:30 p.m., while the vessel was underway and maneuvering;

b. Provided no second crewmember to steady the shelving, hand down stock, or assist her;

c. Had no procedure requiring that stock be retrieved from the upper shelves by two crewmembers, with a ladder, or while the vessel was in port;

d. Scheduled the shop department so short-handed that a crewmember under a lifting restriction performed stock retrieval alone; and

e. Other acts and omissions of the same kind that will be found in discovery and proven at trial.

95. Defendant, HARDING INC., knew or should have known of the foregoing methods of work and had the opportunity to correct it.

96. HARDING INC.'s negligence played a part, however slight, in producing MS. SINCLAIR's fall and her resulting lumbar spine injury, left lower-extremity nerve injury, and knee and hip pain.

97. As a direct and proximate result of the negligence of the Defendant, its agents, and its employees, MS. SINCLAIR suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization and of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of previously existing conditions. The losses are permanent or continuing, and she will suffer them in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, HARDING INC., for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

## COUNT XI
## Failure to Provide Prompt, Proper, and Adequate Medical Care Against HARDING INC.

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

98. This Count is pleaded in the alternative to the Counts against CARNIVAL and applies if the trier of fact finds that HARDING INC. was MS. SINCLAIR's Jones Act employer, joint employer, or borrowing employer.

99. Under the Jones Act and the general maritime law, Defendant, HARDING INC., as MS. SINCLAIR's Jones Act employer, joint employer, or borrowing employer, owed the duty to

provide prompt, proper, and adequate medical care to seamen who fall ill or suffer injury in the service of the vessel, and is liable for the negligence of the shipboard and shoreside medical providers to whom it entrusted her care. *De Zon v. American President Lines, Ltd.*, 318 U.S. 660, 667–69 (1943); *Central Gulf Steamship Corp. v. Sambula*, 405 F.2d 291, 301–02 (5th Cir. 1968).

100. The negligent failure to provide prompt medical care to an ill or injured seaman is actionable under the Jones Act as a claim separate from the claim for the injuring event and from the claim for maintenance and cure. *Cortes v. Baltimore Insular Line, Inc.*, 287 U.S. 367, 371–72, 375–76 (1932); *Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 684–85 (10th Cir. 1981).

101. Defendant, HARDING INC., negligently failed to provide MS. SINCLAIR with prompt, proper, adequate, and complete medical care, in that it:

a. Kept her aboard and at work for six weeks after her physicians determined on October 3 and 4, 2023, that she required a hysterectomy and had not reached maximum medical improvement, instead of disembarking her for the surgery;

b. Denied her access to the vessel's medical center during working hours from October 5 through November 17, 2023, and refused the medical center's requests for her release for follow-up;

c. Arranged no medical evaluation of her October 5, 2023 fall or of the back and leg pain she reported afterward;

d. Failed to arrange timely orthopedic and spine evaluation after repatriation, so that her lumbar injury went undiagnosed until March 2024;

e. Terminated treatment of her spine and chest-wall conditions before her treating specialists released her and failed to provide the treatment they recommended; and

f. Other acts and omissions that will be found in discovery and proven at trial.

102. As a direct and proximate result of HARDING INC.'s failure to provide prompt, proper, and adequate medical care, MS. SINCLAIR suffered six further weeks of hemorrhage, anemia, and pain before her surgery, unrelieved pain, delay in the diagnosis and treatment of her spinal injury, aggravation of her underlying injuries, and a prolonged recovery, together with

physical pain and suffering, mental anguish, loss of enjoyment of life, disability, additional medical expenses, lost wages, and impaired earning capacity. The injuries are permanent or continuing, and she will suffer these losses in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, HARDING INC., for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

**COUNT XII**
**Maintenance and Cure Against HARDING INC.**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

103. Defendant, HARDING INC., as MS. SINCLAIR's Jones Act employer, joint employer, or borrowing employer, owes MS. SINCLAIR maintenance and cure for illness and injury that arose or manifested while she was in the service of the vessel, without regard to fault, until she reaches maximum medical cure. *Garay v. Carnival Cruise Line, Inc.*, 904 F.2d 1527, 1530, 1533 (11th Cir. 1990); *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730 (1943). The obligation "has few exceptions or conditions to stir contentions, cause delays, and invite litigations," and it continues until the seaman's incapacity is declared to be permanent. *Vella v. Ford Motor Co.*, 421 U.S. 1, 4–5 (1975). Ambiguities or doubts are resolved in favor of the seaman. *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962). The obligation extends to a seaman "whose condition becomes aggravated or enhanced for any reason, at least until the time that the seaman has achieved maximum medical recovery," and a seaman who has not reached maximum medical recovery "is still in the service of the ship and thus entitled to maintenance and cure for the additional injuries incurred." *Duarte v. Royal Caribbean Cruises, Ltd.*, 761 So. 2d 367, 368 (Fla. 3d DCA 2000).

104. MS. SINCLAIR's uterine condition, as diagnosed aboard on October 3, 2023, and her anemia, pelvic pain, lumbar spine injury, left lower-extremity nerve injury, knee and hip pain,

and chest-wall pain arose, manifested, or were aggravated while she was in the service of the Carnival Radiance and before she reached maximum medical recovery for any of them. She has not reached maximum medical cure for her lumbar spine, lower-extremity, or chest-wall conditions. Her treating spine surgeon has prescribed continuing treatment and a lumbar brace and has identified an epidural block as the next step; her mastologist has recommended an ultrasound-guided intercostal nerve infiltration and neuromodulators.

105. Defendant, HARDING INC., has breached its obligation by: (a) paying no maintenance at all from November 18, 2023, to the present; (b) stopping sick wages and unearned wages after March 6, 2024, except for a single payment of $353.96 on July 5, 2024, although MS. SINCLAIR's agreement promised her basic wage until fit for work for up to 16 weeks and the general maritime law entitles her to unearned wages through the end of her contract period; (c) terminating cure on the strength of maximum-medical-improvement declarations obtained from physicians in other specialties while her spine surgeon and mastologist continued to treat her and to recommend care; and (d) refusing, since counsel's demand of April 11, 2025, to reinstate any benefit.

106. As a result of HARDING INC.'s failure to provide maintenance and cure, MS. SINCLAIR has suffered the aggravation and prolongation of her injuries, physical pain and suffering, mental anguish, loss of enjoyment of life, disability, medical expenses in the past and future, loss of found, and lost wages and earning capacity. The injuries are permanent or continuing, and she will suffer these losses in the future.

107. MS. SINCLAIR has retained an attorney to enforce her maintenance-and-cure rights and is entitled to recover her attorney's fees incurred in obtaining those benefits. *Vaughan*, 369 U.S. at 530–31.

108. HARDING INC.'s failure to provide maintenance and cure was not the product of a reasonable investigation or a good-faith dispute. It paid no maintenance at any time, cut off wages while MS. SINCLAIR was recovering from major surgery, conducted no investigation after receiving counsel's demand, and relied on its own claims administrator's selection of physicians to

declare her at maximum medical improvement. Its conduct was willful, wanton, arbitrary, and in callous disregard of her rights as a seaman. A seaman may recover punitive damages for the willful and wanton disregard of the maintenance-and-cure obligation. *Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 424 (2009).

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, HARDING INC., for maintenance, cure, and unearned wages; compensatory damages for the failure to provide maintenance and cure and for the aggravation of her injuries caused by that failure; punitive damages for the willful, wanton, and arbitrary failure to provide maintenance and cure; attorney's fees incurred in obtaining maintenance and cure; court costs, interest, and prejudgment interest; and demands trial by jury of all issues so triable.

**COUNT XIII**
**HARDING GUERNSEY's Jones Act Negligence: Assignment of Work in Violation of Medical Restriction (October 3 through November 17, 2023)**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

109. This Count is pleaded in the alternative to the Counts against CARNIVAL and HARDING INC. and applies only if the trier of fact finds that HARDING GUERNSEY, rather than CARNIVAL or HARDING INC., was MS. SINCLAIR's Jones Act employer.

110. Defendant, HARDING GUERNSEY, as MS. SINCLAIR's Jones Act employer, owed her the duty to assign her only work that she was physically able to perform safely and to honor the medical restrictions placed on her.

111. From October 3, 2023, through her disembarkation on November 17, 2023, MS. SINCLAIR was injured as a direct and proximate result of HARDING GUERNSEY's breach of that duty, directly and through its agents and employees, in that it:

a. After October 3, 2023, assigned MS. SINCLAIR work that required lifting stock and promotional tables in excess of the 15-kilogram restriction imposed by her physicians, including the stock retrieval during which she fell on October 5, 2023;
b. Through the Shop Manager, told MS. SINCLAIR that her restriction was unfair to him and to her coworkers and pressed her to work through it;
c. Kept MS. SINCLAIR working aboard for six weeks after her physicians determined on October 3 and 4, 2023, that she required a hysterectomy and had not reached maximum medical improvement; and
d. Other acts and omissions of the same kind that will be found in discovery and proven at trial.

112. Defendant, HARDING GUERNSEY, knew or should have known of the foregoing conditions and had the opportunity to correct it.

113. HARDING GUERNSEY's negligence played a part, however slight, in producing MS. SINCLAIR's injuries, including six further weeks of hemorrhage, anemia, and pain before her surgery, the aggravation of her uterine condition, her fall of October 5, 2023, and the strain on her lumbar spine from lifting beyond her restriction.

114. As a direct and proximate result of the negligence of the Defendant, its agents, and its employees, MS. SINCLAIR suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization and of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of previously existing conditions. The losses are permanent or continuing, and she will suffer them in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, HARDING GUERNSEY, for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

**COUNT XIV**
**HARDING GUERNSEY's Jones Act Negligence: Unsafe Condition of the Deck 0 Storeroom (October 5, 2023)**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

115. This Count is pleaded in the alternative to the Counts against CARNIVAL and HARDING INC. and applies only if the trier of fact finds that HARDING GUERNSEY, rather than CARNIVAL or HARDING INC., was MS. SINCLAIR's Jones Act employer.

116. Defendant, HARDING GUERNSEY, as MS. SINCLAIR's Jones Act employer, owed her the duty to provide her a reasonably safe place to work, including storerooms, shelving, and equipment reasonably safe for the retrieval of stock.

117. On or about October 5, 2023, MS. SINCLAIR was injured as a direct and proximate result of HARDING GUERNSEY's breach of that duty, directly and through its agents and employees, in that the Deck 0 storeroom in which she was required to work:

a. Was fitted with high shelving that required crewmembers to climb the shelving itself to retrieve stock stowed on the upper shelves;
b. Had no ladder, step stool, or fall protection for reaching the upper shelves;
c. Had its deck obstructed by hard plastic storage bins stacked at the base of the shelving, onto which a crewmember who lost her footing would fall;
d. Was stocked so that heavy and frequently needed merchandise sat on the upper shelves rather than at or below shoulder height; and
e. Had other unsafe conditions that will be found in discovery and proven at trial.

118. Defendant, HARDING GUERNSEY, knew or should have known of the foregoing conditions and had the opportunity to correct it.

119. HARDING GUERNSEY's negligence played a part, however slight, in producing MS. SINCLAIR's fall and her resulting lumbar spine injury, including the annular tear at L4-L5 and facet injury, her left lower-extremity nerve injury, and her knee and hip pain.

120. As a direct and proximate result of the negligence of the Defendant, its agents, and its employees, MS. SINCLAIR suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization and of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of previously existing conditions. The losses are permanent or continuing, and she will suffer them in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, HARDING GUERNSEY, for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

**COUNT XV**
**HARDING GUERNSEY's Jones Act Negligence: Unsafe Method of Work in the Storeroom (October 5, 2023)**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

121. This Count is pleaded in the alternative to the Counts against CARNIVAL and HARDING INC. and applies only if the trier of fact finds that HARDING GUERNSEY, rather than CARNIVAL or HARDING INC., was MS. SINCLAIR's Jones Act employer.

122. Defendant, HARDING GUERNSEY, as MS. SINCLAIR's Jones Act employer, owed her the duty to adopt and enforce reasonably safe methods of work and to furnish adequate staffing and assistance for the tasks she was assigned.

123. On or about October 5, 2023, MS. SINCLAIR was injured as a direct and proximate result of HARDING GUERNSEY's breach of that duty, directly and through its agents and employees, in that it:

a. Sent MS. SINCLAIR, a crewmember under a known 15-kilogram lifting restriction, to retrieve stock from the upper shelves alone, at about 9:30 p.m., while the vessel was underway and maneuvering;

b. Provided no second crewmember to steady the shelving, hand down stock, or assist her;

c. Had no procedure requiring that stock be retrieved from the upper shelves by two crewmembers, with a ladder, or while the vessel was in port;

d. Scheduled the shop department so short-handed that a crewmember under a lifting restriction performed stock retrieval alone; and

e. Other acts and omissions of the same kind that will be found in discovery and proven at trial.

124. Defendant, HARDING GUERNSEY, knew or should have known of the foregoing methods of work and had the opportunity to correct it.

125. HARDING GUERNSEY's negligence played a part, however slight, in producing MS. SINCLAIR's fall and her resulting lumbar spine injury, left lower-extremity nerve injury, and knee and hip pain.

126. As a direct and proximate result of the negligence of the Defendant, its agents, and its employees, MS. SINCLAIR suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization and of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of previously existing conditions. The losses are permanent or continuing, and she will suffer them in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, HARDING GUERNSEY, for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

**COUNT XVI**
**Failure to Provide Prompt, Proper, and Adequate Medical Care Against HARDING GUERNSEY**

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

127. This Count is pleaded in the alternative to the Counts against CARNIVAL and HARDING INC. and applies only if the trier of fact finds that HARDING GUERNSEY, rather than CARNIVAL or HARDING INC., was MS. SINCLAIR's Jones Act employer.

128. Under the Jones Act and the general maritime law, Defendant, HARDING GUERNSEY, as MS. SINCLAIR's Jones Act employer, owed the duty to provide prompt, proper, and adequate medical care to seamen who fall ill or suffer injury in the service of the vessel, and is liable for the negligence of the shipboard and shoreside medical providers to whom it entrusted her care. *De Zon v. American President Lines, Ltd.*, 318 U.S. 660, 667–69 (1943); *Central Gulf Steamship Corp. v. Sambula*, 405 F.2d 291, 301–02 (5th Cir. 1968).

129. The negligent failure to provide prompt medical care to an ill or injured seaman is actionable under the Jones Act as a claim separate from the claim for the injuring event and from the claim for maintenance and cure. *Cortes v. Baltimore Insular Line, Inc.*, 287 U.S. 367, 371–72, 375–76 (1932); *Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 684–85 (10th Cir. 1981).

130. Defendant, HARDING GUERNSEY, negligently failed to provide MS. SINCLAIR with prompt, proper, adequate, and complete medical care, in that it:

a. Kept her aboard and at work for six weeks after her physicians determined on October 3 and 4, 2023, that she required a hysterectomy and had not reached maximum medical improvement, instead of disembarking her for the surgery;

b. Denied her access to the vessel's medical center during working hours from October 5 through November 17, 2023, and refused the medical center's requests for her release for follow-up;

c. Arranged no medical evaluation of her October 5, 2023 fall or of the back and leg pain she reported afterward;

d. Failed to arrange timely orthopedic and spine evaluation after repatriation, so that her lumbar injury went undiagnosed until March 2024;

e. Terminated treatment of her spine and chest-wall conditions before her treating specialists released her and failed to provide the treatment they recommended; and

f. Other acts and omissions that will be found in discovery and proven at trial.

131. As a direct and proximate result of HARDING GUERNSEY's failure to provide prompt, proper, and adequate medical care, MS. SINCLAIR suffered six further weeks of hemorrhage, anemia, and pain before her surgery, unrelieved pain, delay in the diagnosis and treatment of her spinal injury, aggravation of her underlying injuries, and a prolonged recovery, together with physical pain and suffering, mental anguish, loss of enjoyment of life, disability, additional medical expenses, lost wages, and impaired earning capacity. The injuries are permanent or continuing, and she will suffer these losses in the future.

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, HARDING GUERNSEY, for all damages allowed under the general maritime law, including compensatory damages, court costs, interest, and prejudgment interest, and demands trial by jury of all issues so triable.

## COUNT XVII
## Maintenance and Cure Against HARDING GUERNSEY (Pleaded in the Alternative)

MS. SINCLAIR realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as though fully set forth in this Count, and further alleges. Plaintiff does not incorporate into this Count the allegations of any other Count.

132. Defendant, HARDING GUERNSEY, as the employer named in MS. SINCLAIR's written employment agreement, owes MS. SINCLAIR maintenance and cure for illness and injury that arose or manifested while she was in the service of the vessel, without regard to fault, until she reaches maximum medical cure. *Garay v. Carnival Cruise Line, Inc.*, 904 F.2d 1527, 1530, 1533

(11th Cir. 1990); *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730 (1943). The obligation "has few exceptions or conditions to stir contentions, cause delays, and invite litigations," and it continues until the seaman's incapacity is declared to be permanent. *Vella v. Ford Motor Co.*, 421 U.S. 1, 4–5 (1975). Ambiguities or doubts are resolved in favor of the seaman. *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962). The obligation extends to a seaman "whose condition becomes aggravated or enhanced for any reason, at least until the time that the seaman has achieved maximum medical recovery," and a seaman who has not reached maximum medical recovery "is still in the service of the ship and thus entitled to maintenance and cure for the additional injuries incurred." *Duarte v. Royal Caribbean Cruises, Ltd.*, 761 So. 2d 367, 368 (Fla. 3d DCA 2000).

133. MS. SINCLAIR's uterine condition, as diagnosed aboard on October 3, 2023, and her anemia, pelvic pain, lumbar spine injury, left lower-extremity nerve injury, knee and hip pain, and chest-wall pain arose, manifested, or were aggravated while she was in the service of the Carnival Radiance and before she reached maximum medical recovery for any of them. She has not reached maximum medical cure for her lumbar spine, lower-extremity, or chest-wall conditions. Her treating spine surgeon has prescribed continuing treatment and a lumbar brace and has identified an epidural block as the next step; her mastologist has recommended an ultrasound-guided intercostal nerve infiltration and neuromodulators.

134. Defendant, HARDING GUERNSEY, has breached its obligation by: (a) paying no maintenance at all from November 18, 2023, to the present; (b) stopping sick wages and unearned wages after March 6, 2024, except for a single payment of $353.96 on July 5, 2024, although MS. SINCLAIR's agreement promised her basic wage until fit for work for up to 16 weeks and the general maritime law entitles her to unearned wages through the end of her contract period; (c) terminating cure on the strength of maximum-medical-improvement declarations obtained from physicians in other specialties while her spine surgeon and mastologist continued to treat her and to recommend care; and (d) refusing, since counsel's demand of April 11, 2025, to reinstate any benefit.

135. As a result of HARDING GUERNSEY's failure to provide maintenance and cure, MS. SINCLAIR has suffered the aggravation and prolongation of her injuries, physical pain and suffering, mental anguish, loss of enjoyment of life, disability, medical expenses in the past and future, loss of found, and lost wages and earning capacity. The injuries are permanent or continuing, and she will suffer these losses in the future.

136. MS. SINCLAIR has retained an attorney to enforce her maintenance-and-cure rights and is entitled to recover her attorney's fees incurred in obtaining those benefits. *Vaughan*, 369 U.S. at 530–31.

137. HARDING GUERNSEY's failure to provide maintenance and cure was not the product of a reasonable investigation or a good-faith dispute. It paid no maintenance at any time, cut off wages while MS. SINCLAIR was recovering from major surgery, conducted no investigation after receiving counsel's demand, and relied on its own claims administrator's selection of physicians to declare her at maximum medical improvement. Its conduct was willful, wanton, arbitrary, and in callous disregard of her rights as a seaman. A seaman may recover punitive damages for the willful and wanton disregard of the maintenance-and-cure obligation. *Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 424 (2009).

WHEREFORE, Plaintiff, JOAN YAMILITH SINCLAIR, demands judgment against Defendant, HARDING GUERNSEY, for maintenance, cure, and unearned wages; compensatory damages for the failure to provide maintenance and cure and for the aggravation of her injuries caused by that failure; punitive damages for the willful, wanton, and arbitrary failure to provide maintenance and cure; attorney's fees incurred in obtaining maintenance and cure; court costs, interest, and prejudgment interest; and demands trial by jury of all issues so triable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted this 4th day of October, 2026.

**BILLERA LAW**
Attorneys for Plaintiff
8130 Glades Road, No. 391
Boca Raton, FL 33434
T: (561) 500-7777
F: (561) 500-7778
Primary Email: John@Billeralaw.com
Secondary Email: Nigina@Billeralaw.com
Third Email: filing@billeralaw.com

By: /s/ John F. Billera
JOHN F. BILLERA, ESQ.
Florida Bar No.: 869041

# COMPOSITE EXHIBIT A

Seafarer Employment Agreements dated August 29, 2023 and September 13, 2023

Harding Brothers (Guernsey) Limited
Suite 2, 4th Floor, West Wing, Trafalgar Court
Admiral Park, St Peter Port, Guernsey, GY1 2JA
Telephone: +44 (0) 1481 740932, Facsimile: +44 (0) 1481 740937

29-08-2023

Dear Joan Yamilith,

**Seafarer's Employment Agreement**

Welcome on board!

We are delighted that you have decided to join us working on board a ship in one of the shops operated by Harding Brothers Retail Limited.

In order to become formally employed by Harding Brothers (Guernsey) Limited we need you please to sign your employment contract known as your Seafarer's Employment Agreement, or SEA.

You will find attached one copy of the SEA. You should please immediately:

1. check the details, and then once you are satisfied,
2. sign and date in the space provided at the end of the agreement,
3. a copy will then be e-mailed to you, your shop manager and your employer, please download this and keep it for your own records.
   *(it is important that you retain your copy in a safe place as you may be asked to produce it for inspection if the ship is subject to audit by the maritime authorities.)*

If you have any questions now or in the future during your time on board then please raise these in the first instance with your Shop Manager who will either be able to answer your questions directly or obtain answers or support from our shore-side scheduling team.

Yours sincerely

**HARDING BROTHERS (GUERNSEY) LIMITED**

*Harding Brothers (Guernsey) Limited*
*Suite 2, 4th Floor, West Wing, Trafalgar Court*
*Admiral Park, St Peter Port, Guernsey, GY1 2JA*
*Telephone: +44 (0) 1481 740932, Facsimile: +44 (0) 1481 740937*

# SEAFARER EMPLOYMENT AGREEMENT

*This statement meets the requirements of Regulation 2.1 and Standard A2.1 of the Maritime Labour Convention, 2006. This statement relates to the Seafarer Employment Agreement of the person named below and supersedes any previous agreements or contracts.*

**This agreement (the "Agreement") is between:**

**Seafarer's Full Name:** Joan Yamilith Sinclair

**(the "Employee")**
**Seafarer's Date of Birth:** 08-09-1975
**Seafarer's Place of Birth:** Nicaragua
**Seafarer's Nationality:** Nicaragua
**Seafarer's Address:** Urb San Miguel, De La Aguja 2 Andenes Sur Casa 5D22, Managua, 15700 , Nicaragua

**Seafarer's Home Airport:** Managua - Augusto C Sandino, Nicaragua (MGA)

**And:**
**Name of Employer:** Harding Brothers (Guernsey) Limited (the "Company")
**Address of Employer:** Suite 2, 4th Floor, West Wing, Trafalgar Court,
Admiral Park, St Peter Port
Guernsey, GY1 2JA, Channel Islands
**The Employee is employed in the role of:**
**Job Title:** Trainee Assistant Manager
**Ship Name:** Carnival Radiance
**Ships Flag:** Panama
**Ship Owner's Name:** Carnival Cruise Line a division of Carnival Corporation
**Ship Owner's Address:** 3655 NW 87th Avenue, Florida, Miami, 33178, United States

*You may though be required to work on any ship listed in Appendix 1 of the Agreement.*

**Note:** The Ship Owner is <u>not</u> your employer. Details of the ship owner are provided for your information.
**Port of Embarkation:** Los Angeles
**Date of Embarkation:** 28-08-2023
**Agreement Start Date:** 28-08-2023
**Agreement End Date:** 17-11-2023

** This will be confirmed on board once a suitable date/port of disembarkation has been identified meeting the business needs within 15 days of the above contract End Date.*

**1. Job Title**
You are being employed in the role detailed above. If your role changes during your contract, this variation will be notified to you in writing. The Company may from time to time require you to undertake additional or other duties as necessary to meet the needs of the business on a short-term basis, e.g. holiday or sickness cover.

**2. Probationary Period**
New Employees join the Company on a 3-month probationary period. During and/or at the end of your probationary period you will attend an employment review to discuss your overall work performance. Absence, timekeeping, and general attitude will be considered in evaluation of your performance. If you do not reach and maintain the required standards during your probationary period, your employment may be terminated with notice. The Company, at its sole discretion, reserves the right to extend the probationary period. At the end of your probationary period your employment will either be confirmed or terminated with the required notice.

**3. References & Pre- Employment Requirements**
You are required to obtain a current passport, C1D visa, seaman's discharge book, medical fitness certificate and two satisfactory employment references. Failure to comply with the request or failure to provide satisfactory documentation may lead to your offer of employment being withdrawn, or your employment being terminated immediately without notice.

**4. Place of Work**
Your normal place of work is on the ship listed above; you may though be required to work on any ship listed in Appendix 1 of the Agreement.

**5. Pay Arrangements**
Your salary is $225.00/week. Payment is made monthly in arrears on the 6th working day (working days are Monday to Friday and exclude UK Bank Holidays) of each month via a pre-paid Visa or Mastercard.

If a mistake is made in the payment of any monies due, the Company expects to be notified immediately. The error will be corrected at the next available opportunity.

Any changes to salary will be notified to you in writing.

The Company reserves the right to make deductions from your salary or to require you to repay money to the Company in relation to (this is not an exhaustive list):

* Cost of repairing any damage or loss to Company property or client's property caused by your negligence.
* Any money requested in writing by you to be deducted.
* Failure to serve out your contractual notice period.
* Any repatriation expenses incurred by the Company as a result of you breaching this Agreement including but not limited to committing an act deemed to be misconduct.

**6. Tax and Social Security**

You will be paid monthly on a gross basis with no deductions for income tax, National Insurance, or other social security contributions. Should your financial affairs be such that you are liable to pay income tax and/or make National Insurance or other social security contributions then you are responsible for making the necessary payments directly to the relevant authorities. You agree to indemnify the Company in respect of any claim against the Company made as a result of your failure to make any payments due.

**7. Hours of Work and Rest**

Your workday will vary when the ship is at sea and in port. A copy of your daily work rostering will always be made available to you.

Your hours of work will be arranged such as to ensure that you receive a minimum of 10 hours available for rest in each 24-hour period and a minimum of 77 hours rest in each seven-day period. This minimum period of rest may not be reduced below 10 hours except in an emergency. Hours of rest may be divided into no more than two periods, one of which shall be at least six hours in length, and the interval between consecutive periods of rest shall not exceed 14 hours.

You may be required, at the absolute discretion of the Master, to work additional hours during an emergency affecting the safety of the ship, its passengers, crew or cargo or the marine environment or to give assistance to other ships or persons in peril. You may also be required to work hours for safety drills such as musters, firefighting, and lifeboat drills.

These duties will be in compliance with applicable flag state law on hours of work and rest.

**8. Guaranteed Monthly Wage**

Employees receive a Guaranteed Monthly Wage for each calendar month worked. Except as otherwise specified herein, this Guaranteed Monthly Wage includes all the compensation Employees will receive for all hours worked including, without limitation, overtime hours and for working on Saturdays, Sunday, and public holidays, whether locally, nationally, or internationally observed and paid leave, which is calculated on the basis of 4 calendar days per month of employment.

**9. Sickness Absences**

If you become sick or injured whilst on your tour of duty, you will be paid your normal basic wage until you are fit for work (including after having been repatriated in accordance with the repatriation provisions set out below), up to a maximum of 16 weeks from the date of injury or commencement of illness.

**10. Medical Care**

If you require medical care while you are on-board this will be provided free of charge, including access to necessary medicines, medical equipment and facilities for diagnosis and treatment and medical information and expertise.

Where necessary, you will be given leave to visit a qualified medical doctor or dentists in ports of call or repatriated to your home country for the purpose of obtaining treatment.

Please note that this provision is subject to you satisfying the insurer's terms and conditions. More information with regards to this can be found in appendix 2.

**11. Compassionate Leave**

The Company recognises that in exceptional circumstances it may be necessary for an Employee to leave the vessel at short notice in the event of the bereavement of next of kin (defined as **immediate** family i.e., parent, sibling, or child). In such cases, the Company will arrange for your immediate disembarkation at the first available opportunity.

In all other cases, you may apply for compassionate leave to your Shop Manager in writing and your request will be considered by the Company in the light of all circumstances.

Employees will not be paid during a period of compassionate leave.

**12. Repatriation**

You will be entitled to repatriation to your country of residence, at the expense of the Company, if you are away from your country of residence when this Agreement is terminated:

* by the Company.
* in circumstances where you are no longer able to carry out your duties under this Agreement or cannot be expected to do so e.g. shipwreck, the sale of your ship, or a change in your ship's registration.

In the event of your abandonment due to insolvency of the Company you will be entitled to have your costs of repatriation met from financial security provided by the company to cover such an eventuality.

You may not be entitled to repatriation at the expense of the Company in circumstances where you have been dismissed on disciplinary grounds or have breached your obligations under this Agreement.

For more information, please refer to the Company Travel Policy.

**13. Disciplinary Procedure & Rules**

Should your conduct or performance fall below the standards required then disciplinary action may be taken. This procedure is designed to help and encourage Employees to achieve and maintain the Company's standards of conduct and performance. It should be looked upon as a corrective process ensuring fair treatment for all Employees regardless of status.

A more detailed explanation of the procedure and rules is contained in the Seafarer's Handbook.

**14. Disciplinary Appeal Procedure**

You have the right to appeal at any stage in the disciplinary procedure if you are dissatisfied either with a disciplinary decision made against you or the level of penalty imposed. You should do this in writing in accordance with the procedure contained in the Seafarer's Handbook.

The Disciplinary Procedure is not contractual.

**15. Complaints Procedure**

If you have any grievance relating to your employment, you should initially raise it with your Shop Manager. If this does not result in the matter being resolved to your satisfaction you should raise the matter formally through the Grievance Procedure. A more detailed explanation of the procedure is contained in the Seafarer's Handbook.

The Grievance Procedure is not contractual.

**16. Death in Service**

In the event of your death occurring on board or ashore during a voyage the Company will meet the cost of burial expenses, or cremation where appropriate or required by local legislation and the return of your property left on board to your next of kin.

**17. Compensation for Loss of Personal Property**

Where you lose personal property, as a result of the vessel on which you are serving foundering or being lost, the Company will pay compensation. Details of the levels of cover can be found in the Company Insurance Policy.

**18. Notice Periods & Termination**

The notice period to be given by you to the Company should you wish to terminate this Agreement and therefore end your employment shall be **7 days**. The itinerary and location of the vessel will determine the port of disembarkation within the 7-day timeframe.

The notice period to be given by the Company to you should the Company wish to terminate Agreement and therefore end your employment shall be **7 days**, except in cases of dismissal for gross misconduct, as detailed in the Disciplinary Policy.

In the event of a foundering or shipwreck of the vessel this Agreement will not automatically be terminated. You will continue to be employed by the Company and entitled to remuneration in accordance with this Agreement until the earlier of the Agreement End Date or until this Agreement is terminated in accordance with clause 18.

The Company has the right to serve notice of termination of your employment at any time in accordance with the notice provisions above.

Costs of your repatriation will be met in accordance with the Company Travel Policy.

The Company has the right to serve notice of termination of your employment at any time in accordance with the notice provisions above. Costs of your repatriation will be met in accordance with the Company Travel Policy.

On termination of your employment for whatever reason on a specific vessel, the Company will provide you with, as soon as practical, a record of your employment including the name, port of registry, gross or register tonnage and official IMO number of ship, the description of the voyage, the capacity in which you were employed, the date and place of joining the ship and the date and place of leaving the ship.

**19. Pay in Lieu of Notice**

It is agreed that the Company may make a payment in lieu of notice to the Employee and ask he or she not to work their notice period although under this Agreement you have no automatic right to receive pay in lieu of notice. The Employee shall not be entitled to any benefit other than a payment in lieu of such benefits in respect of any period for which payment in lieu of notice has been made.

**20. Confidentiality**

For the purposes of this section “confidential information” shall include (without limitation) information concerning any unpublished financial, trading, or operational information, including particulars of, services charging rates, and statistics in relation to:

* the Company,
* any of the Company’s clients or suppliers so far as it has come to your knowledge by reason of your employment.

You will not (except in the proper performance of your job) either during your employment or at any time after its termination for whatever reason:

* disclose any confidential information to any person,
* use such confidential information for your own personal purposes.

You will use your best endeavours to prevent:

* the publication or disclosure of confidential information,
* any misuse of such information.

You must obtain permission in writing from the most senior person in the Company before agreeing to give any lecture, press interview, or to publish any article, which would give details of the Company’s business.

**21. Intellectual Property**
It will be part of your duties to consider how the products, services, processes, equipment, or systems of the Company might be improved, promoted, and marketed.

You acknowledge that all intellectual property rights (including copyright and patents), inventions and other material of any nature made, originated or developed by you at any time in the course of your employment with the Company (whether or not made, originated or developed during normal working hours and whether before or after the date of this Agreement) shall belong to and vest in the Company absolutely to the full extent permitted by law. To the extent that such rights do not vest in the Company automatically, you hold these on trust for the Company.

You agree to provide full written details of any such intellectual property rights, inventions, and other materials to the Company promptly on their creation. You acknowledge that, except as provided by law, no further remuneration or compensation is or may become due to you in respect of your compliance with this clause.

You undertake to provide the Company with every assistance in protecting the Company's intellectual property rights.

**22. Conflict of Interest**
During your employment you will be expected to devote the whole of your working time and attention to the business of the Company and to use your best endeavours to promote the Company's general interest.

If required to do so you must provide details of any relationships with any clients or suppliers of the Company and comply with any reasonable instructions given to you by a Manager on such relationships.

**23. Invalidity & Severability**
All terms contained in this document are governed by the Maritime Labour Convention, 2006. If any court or administrative body of competent jurisdiction shall find any provision of this Agreement invalid or unenforceable, the invalidity or enforceability of such a provision shall not affect the other provisions of this Agreement and all provisions not affected by such invalidity or unenforceability shall remain in full force and effect. The parties agree to attempt to substitute for an invalid or unenforceable provision, a valid or enforceable provision, which achieves to the greatest extent possible the economic, legal, and commercial objectives of the invalid or unenforceable provision.

**24. Other Terms & Conditions of Employment**

Any amendments that materially alter the terms and conditions contained in this Agreement will be notified to you in writing and shall take precedence over the terms in this Agreement.

By signing this Agreement, you understand and confirm acceptance of the terms and conditions as indicated in this Agreement, confirm that you have given sufficient opportunity to examine and seek advice with regard to this Agreement prior signing and confirm that you have been provided with an original signed copy of this Agreement for your records.

**25. Law and Jurisdiction**

This Agreement and all claims or disputes arising under or as a result of it will be governed by and interpreted in accordance with the laws of Guernsey and the Courts of Guernsey shall have exclusive jurisdiction to determine any matters.

**Appendices** The attached appendices will detail any additional contractual information.

This Agreement has been entered into onboard the Carnival Radiance on the 28-08-2023

| **Issued By (Company):** | **Received by (Employee):** |
|---|---|
| Harding Brothers (Guernsey) Limited Acting as the Employer and representative of the Ship Owner | Joan Yamilith Sinclair |
| Signed: DocuSigned by: 5759CEAC88D842C... | Signed: DocuSigned by: 3F66871A85914A0... |
| Place of Signing: Guernsey | Date: 31-Aug-2023 |
| Date: 31-Aug-2023 | |

# APPENDIX 1

The following Ships are covered by this Agreement:

| NAME OF SHIP | FLAG OF THE SHIP | NAME OF SHIP | FLAG OF THE SHIP |
|---|---|---|---|
| Arcadia | Bermuda | Seven Seas Mariner | Bahamas |
| Arvia | United Kingdom | Seven Seas Navigator | Bahamas |
| Azura | Bermuda | Seven Seas Voyager | Bahamas |
| Aurora | Bermuda | Seven Seas Explorer | Marshall Islands |
| Britannia | United Kingdom | Seven Seas Splendor | Marshall Islands |
| Iona | United Kingdom | Spirit of Adventure | United Kingdom |
| Ventura | Bermuda | Spirit of Discovery | United Kingdom |
| Carnival Breeze | Panama | Seabourn Encore | Bahamas |
| Carnival Conquest | Panama | Seabourn Odyssey | Bahamas |
| Carnival Elation | Panama | Seabourn Ovation | Bahamas |
| Carnival Glory | Panama | Seabourn Pursuit | Bahamas |
| Carnival Liberty | Panama | Seabourn Quest | Bahamas |
| Carnival Luminosa | Bahamas | Seabourn Sojourn | Bahamas |
| Carnival Mardi Gras | Bahamas | Seabourn Venture | Bahamas |
| Carnival Paradise | Panama | Viking Jupiter | Norway |
| Carnival Radiance | Panama | Viking Mars | Norway |
| Carnival Spirit | Bahamas | Viking Orion | Norway |
| Carnival Splendor | Panama | Viking Neptune | Norway |
| Carnival Vista | Panama | Viking Saturn | Norway |
| Pacific Adventure | United Kingdom | Viking Sea | Norway |
| Pacific Explorer | United Kingdom | Viking Sky | Norway |
| Pacific Encounter | United Kingdom | Viking Star | Norway |
| Scarlet Lady | Bahamas | Viking Venus | Norway |
| Balmoral | Bahamas | Caribbean Princess | Bermuda |
| Bolette | Bahamas | Coral Princess | Bermuda |
| Borealis | Bahamas | Crown Princess | Bermuda |
| Braemar | Bahamas | Diamond Princess | United Kingdom |
| Marina | Marshall Islands | Discovery Princess | Bermuda |
| Regatta | Marshall Islands | Emerald Princess | Bermuda |
| Sirena | Marshall Islands | Enchanted Princess | Bermuda |
| Nautica | Marshall Islands | Grand Princess | Bermuda |
| Insignia | Marshall Islands | Island Princess | Bermuda |
| Riviera | Marshall Islands | Majestic Princess | United Kingdom |
| Vista | Marshall Islands | Regal Princess | Bermuda |
| Fram | Norway | Royal Princess | Bermuda |
| Fridtjof Nansen | Norway | Ruby Princess | Bermuda |
| Maud | Norway | Sapphire Princess | United Kingdom |
| Otto Sverdrup | Norway | Sky Princess | Bermuda |
| Roald Amundsen | Norway | Celestyal Crystal | Malta |
| Marella Explorer | Malta | Celestyal Journey | Bermuda |
| Marella Explorer 2 | Malta | Celestyal Olympia | Malta |
| Marella Discovery 1 | Malta | Norwegian Gem | Bahamas |
| Marella Discovery 2 | Bahamas | Norwegian Jewel | Bahamas |
| Marella Voyager | Malta | Norwegian Prima | Bahamas |
| Queen Elizabeth | Bermuda | Norwegian Spirit | Bahamas |
| Queen Mary II | Bermuda | Norwegian Star | Bahamas |
| Queen Victoria | Bermuda | Norwegian Viva | Bahamas |
| Ambience | Bahamas | | |
| Ambition | Bahamas | | |

# APPENDIX 2
# Medical Insurance Cover

Shipboard Employees will be covered by a medical insurance policy (the premiums of which will be paid for by the Company) from when you leave home on your journey to a ship in preparation for starting your contract until you return home at the end of your contract.

In the event that you require medical treatment (including dental and optical treatment where these are required as a result of an emergency) during this period our appointed medical insurers will be contacted on your behalf prior to treatment taking place and they will advise you of the necessary steps to obtain the treatment that you require and also the method by which the cost of this treatment will be paid.

The extent and level of cover available is as contained within the policy documentation of the insurer. A copy of this cover will have been provided to you at the time you were offered a contract with the Company. Further copies are available on request and a copy is held by the manager on board each ship should you need to refer to it.

Whilst the cover is broad, like all insurance policies there are exclusions that you need to be aware of as follows:

1. Cover specifically excludes claims as a result of journeys:
    a. taken against the advice of a Qualified Medical Practitioner.
    b. where the purpose of the Journey is to receive medical treatment or advice.
    c. where the purpose of the Journey is directly or indirectly related to a medical condition or situation known to exist by the Insured Person.

2. For Journeys that are covered, the insurer shall not be liable for:
    a. expenses incurred as a result of the use by an Insured Person of non-prescribed drugs which cannot be legally obtained from a pharmacy.
    b. expenses incurred as a result of suicide, attempted suicide or self-inflicted injury other than Repatriation Expenses Following Suicide.
    c. any expenses which are recovered from any national insurance programme in connection with any claim.
    d. any expenses incurred 30 days after the time of the incurring of the first expense for the treatment of psychiatric or mental disorders.
    e. any expenses incurred twelve months after:
        i. emergency repatriation to the Country of Domicile in respect of expenses of on- going medical treatment as an in-patient; or
        ii. the time of the incurring of the first expense in respect of other expenses.
    f. treatment which in any way arises from or is attributable to any Human Immunodeficiency Virus infection or related syndrome unless it can be proved to the reasonable satisfaction of the insurer and their medical advisors that this was contracted as a result of a blood transfusion or other medical treatment received for an unrelated injury or illness whilst on a Journey.
    g. loss as a result of the Insured Person being a full-time member of the armed forces of any nation or international authority or a member of any reserve forces called out for permanent service.

3. Pregnancy is not an illness. Any expenses associated with pregnancy are covered if incurred only in an emergency as a result of complications (where such complications are diagnosed by a Qualified Medical Practitioner who specialises in obstetrics).

4. An Employee who requires medical care for injury or illness during the period from the date he/she is entered on the vessel crew list to the date when he/she is repatriated shall, except as otherwise provided herein, be entitled to curative medical treatment (including hospitalization) at the Company's expense until the sick or injured Employee has recovered, or until any sickness or incapacity has been established to be of a permanent nature or until the seafarer is able to claim medical benefits available to him under a scheme of compulsory sickness insurance, accident insurance or other scheme available in his/her country of domicile, whichever comes first.

*Harding Brothers (Guernsey) Limited*
*Suite 2, 4th Floor, West Wing, Trafalgar Court*
*Admiral Park, St Peter Port, Guernsey, GY1 2JA*
*Telephone: +44 (0) 1481 740932, Facsimile: +44 (0) 1481 740937*

13-09-2023

Dear Joan Yamilith,

**Seafarer's Employment Agreement**

Welcome on board!

We are delighted that you have decided to join us working on board a ship in one of the shops operated by Harding Brothers Retail Limited.

In order to become formally employed by Harding Brothers (Guernsey) Limited we need you please to sign your employment contract known as your Seafarer's Employment Agreement, or SEA.

You will find attached one copy of the SEA. You should please immediately:

1. check the details, and then once you are satisfied,
2. sign and date in the space provided at the end of the agreement,
3. a copy will then be e-mailed to you, your shop manager and your employer, please download this and keep it for your own records.
   *(it is important that you retain your copy in a safe place as you may be asked to produce it for inspection if the ship is subject to audit by the maritime authorities.)*

If you have any questions now or in the future during your time on board then please raise these in the first instance with your Shop Manager who will either be able to answer your questions directly or obtain answers or support from our shore-side scheduling team.

Yours sincerely

**HARDING BROTHERS (GUERNSEY) LIMITED**

Harding Brothers (Guernsey) Limited
*Suite 2, 4th Floor, West Wing, Trafalgar Court*
*Admiral Park, St Peter Port, Guernsey, GY1 2JA*
*Telephone: +44 (0) 1481 740932, Facsimile: +44 (0) 1481 740937*

# SEAFARER EMPLOYMENT AGREEMENT

*This statement meets the requirements of Regulation 2.1 and Standard A2.1 of the Maritime Labour Convention, 2006. This statement relates to the Seafarer Employment Agreement of the person named below and supersedes any previous agreements or contracts.*

**This agreement (the "Agreement") is between:**

**Seafarer's Full Name:** Joan Yamilith Sinclair

**(the "Employee")**
**Seafarer's Date of Birth:** 08-09-1975
**Seafarer's Place of Birth:** Nicaragua
**Seafarer's Nationality:** Nicaragua
**Seafarer's Address:** Urb San Miguel, De La Aguja 2 Andenes Sur Casa 5D22, Managua, 15700 , Nicaragua

**Seafarer's Home Airport:** Managua - Augusto C Sandino, Nicaragua (MGA)

**And:**
**Name of Employer:** Harding Brothers (Guernsey) Limited (the "Company")
**Address of Employer:** Suite 2, 4th Floor, West Wing, Trafalgar Court,
Admiral Park, St Peter Port
Guernsey, GY1 2JA, Channel Islands
**The Employee is employed in the role of:**
**Job Title:** Sales Associate
**Ship Name:** Carnival Radiance
**Ships Flag:** Panama
**Ship Owner's Name:** Carnival Cruise Line a division of Carnival Corporation
**Ship Owner's Address:** 3655 NW 87th Avenue, Florida, Miami, 33178, United States

*You may though be required to work on any ship listed in Appendix 1 of the Agreement.*

**Note:** The Ship Owner is <u>not</u> your employer. Details of the ship owner are provided for your information.
**Port of Embarkation:**
**Date of Embarkation:** 25-09-2023
**Agreement Start Date:** 25-09-2023
**Agreement End Date:** 17-11-2023

** This will be confirmed on board once a suitable date/port of disembarkation has been identified meeting the business needs within 15 days of the above contract End Date.*

**1. Job Title**
You are being employed in the role detailed above. If your role changes during your contract, this variation will be notified to you in writing. The Company may from time to time require you to undertake additional or other duties as necessary to meet the needs of the business on a short-term basis, e.g. holiday or sickness cover.

**2. Probationary Period**
New Employees join the Company on a 3-month probationary period. During and/or at the end of your probationary period you will attend an employment review to discuss your overall work performance. Absence, timekeeping, and general attitude will be considered in evaluation of your performance. If you do not reach and maintain the required standards during your probationary period, your employment may be terminated with notice. The Company, at its sole discretion, reserves the right to extend the probationary period. At the end of your probationary period your employment will either be confirmed or terminated with the required notice.

**3. References & Pre- Employment Requirements**
You are required to obtain a current passport, C1D visa, seaman's discharge book, medical fitness certificate and two satisfactory employment references. Failure to comply with the request or failure to provide satisfactory documentation may lead to your offer of employment being withdrawn, or your employment being terminated immediately without notice.

**4. Place of Work**
Your normal place of work is on the ship listed above; you may though be required to work on any ship listed in Appendix 1 of the Agreement.

**5. Pay Arrangements**
Your salary is $225.00/week. Payment is made monthly in arrears on the 6th working day (working days are Monday to Friday and exclude UK Bank Holidays) of each month via a pre-paid Visa or Mastercard.

If a mistake is made in the payment of any monies due, the Company expects to be notified immediately. The error will be corrected at the next available opportunity.

Any changes to salary will be notified to you in writing.

The Company reserves the right to make deductions from your salary or to require you to repay money to the Company in relation to (this is not an exhaustive list):

* Cost of repairing any damage or loss to Company property or client's property caused by your negligence.
* Any money requested in writing by you to be deducted.
* Failure to serve out your contractual notice period.
* Any repatriation expenses incurred by the Company as a result of you breaching this Agreement including but not limited to committing an act deemed to be misconduct.

**6. Tax and Social Security**

You will be paid monthly on a gross basis with no deductions for income tax, National Insurance, or other social security contributions. Should your financial affairs be such that you are liable to pay income tax and/or make National Insurance or other social security contributions then you are responsible for making the necessary payments directly to the relevant authorities. You agree to indemnify the Company in respect of any claim against the Company made as a result of your failure to make any payments due.

**7. Hours of Work and Rest**

Your workday will vary when the ship is at sea and in port. A copy of your daily work rostering will always be made available to you.

Your hours of work will be arranged such as to ensure that you receive a minimum of 10 hours available for rest in each 24-hour period and a minimum of 77 hours rest in each seven-day period. This minimum period of rest may not be reduced below 10 hours except in an emergency. Hours of rest may be divided into no more than two periods, one of which shall be at least six hours in length, and the interval between consecutive periods of rest shall not exceed 14 hours.

You may be required, at the absolute discretion of the Master, to work additional hours during an emergency affecting the safety of the ship, its passengers, crew or cargo or the marine environment or to give assistance to other ships or persons in peril. You may also be required to work hours for safety drills such as musters, firefighting, and lifeboat drills.

These duties will be in compliance with applicable flag state law on hours of work and rest.

**8. Guaranteed Monthly Wage**
Employees receive a Guaranteed Monthly Wage for each calendar month worked. Except as otherwise specified herein, this Guaranteed Monthly Wage includes all the compensation Employees will receive for all hours worked including, without limitation, overtime hours and for working on Saturdays, Sunday, and public holidays, whether locally, nationally, or internationally observed and paid leave, which is calculated on the basis of 4 calendar days per month of employment.

**9. Sickness Absences**
If you become sick or injured whilst on your tour of duty, you will be paid your normal basic wage until you are fit for work (including after having been repatriated in accordance with the repatriation provisions set out below), up to a maximum of 16 weeks from the date of injury or commencement of illness.

**10. Medical Care**
If you require medical care while you are on-board this will be provided free of charge, including access to necessary medicines, medical equipment and facilities for diagnosis and treatment and medical information and expertise.

Where necessary, you will be given leave to visit a qualified medical doctor or dentists in ports of call or repatriated to your home country for the purpose of obtaining treatment.

Please note that this provision is subject to you satisfying the insurer's terms and conditions. More information with regards to this can be found in appendix 2.

**11. Compassionate Leave**
The Company recognises that in exceptional circumstances it may be necessary for an Employee to leave the vessel at short notice in the event of the bereavement of next of kin (defined as **immediate** family i.e., parent, sibling, or child). In such cases, the Company will arrange for your immediate disembarkation at the first available opportunity.

In all other cases, you may apply for compassionate leave to your Shop Manager in writing and your request will be considered by the Company in the light of all circumstances.

Employees will not be paid during a period of compassionate leave.

**12. Repatriation**
You will be entitled to repatriation to your country of residence, at the expense of the Company, if you are away from your country of residence when this Agreement is terminated:

* by the Company.
* in circumstances where you are no longer able to carry out your duties under this Agreement or cannot be expected to do so e.g. shipwreck, the sale of your ship, or a change in your ship's registration.

In the event of your abandonment due to insolvency of the Company you will be entitled to have your costs of repatriation met from financial security provided by the company to cover such an eventuality.

You may not be entitled to repatriation at the expense of the Company in circumstances where you have been dismissed on disciplinary grounds or have breached your obligations under this Agreement.

For more information, please refer to the Company Travel Policy.

**13. Disciplinary Procedure & Rules**
Should your conduct or performance fall below the standards required then disciplinary action may be taken. This procedure is designed to help and encourage Employees to achieve and maintain the Company's standards of conduct and performance. It should be looked upon as a corrective process ensuring fair treatment for all Employees regardless of status.

A more detailed explanation of the procedure and rules is contained in the Seafarer's Handbook.

**14. Disciplinary Appeal Procedure**
You have the right to appeal at any stage in the disciplinary procedure if you are dissatisfied either with a disciplinary decision made against you or the level of penalty imposed. You should do this in writing in accordance with the procedure contained in the Seafarer's Handbook.

The Disciplinary Procedure is not contractual.

**15. Complaints Procedure**
If you have any grievance relating to your employment, you should initially raise it with your Shop Manager. If this does not result in the matter being resolved to your satisfaction you should raise the matter formally through the Grievance Procedure. A more detailed explanation of the procedure is contained in the Seafarer's Handbook.

The Grievance Procedure is not contractual.

**16. Death in Service**
In the event of your death occurring on board or ashore during a voyage the Company will meet the cost of burial expenses, or cremation where appropriate or required by local legislation and the return of your property left on board to your next of kin.

**17. Compensation for Loss of Personal Property**
Where you lose personal property, as a result of the vessel on which you are serving foundering or being lost, the Company will pay compensation. Details of the levels of cover can be found in the Company Insurance Policy.

**18. Notice Periods & Termination**
The notice period to be given by you to the Company should you wish to terminate this Agreement and therefore end your employment shall be **7 days**. The itinerary and location of the vessel will determine the port of disembarkation within the 7-day timeframe.

The notice period to be given by the Company to you should the Company wish to terminate Agreement and therefore end your employment shall be **7 days**, except in cases of dismissal for gross misconduct, as detailed in the Disciplinary Policy.

In the event of a foundering or shipwreck of the vessel this Agreement will not automatically be terminated. You will continue to be employed by the Company and entitled to remuneration in accordance with this Agreement until the earlier of the Agreement End Date or until this Agreement is terminated in accordance with clause 18.

The Company has the right to serve notice of termination of your employment at any time in accordance with the notice provisions above.

Costs of your repatriation will be met in accordance with the Company Travel Policy.

The Company has the right to serve notice of termination of your employment at any time in accordance with the notice provisions above. Costs of your repatriation will be met in accordance with the Company Travel Policy.

On termination of your employment for whatever reason on a specific vessel, the Company will provide you with, as soon as practical, a record of your employment including the name, port of registry, gross or register tonnage and official IMO number of ship, the description of the voyage, the capacity in which you were employed, the date and place of joining the ship and the date and place of leaving the ship.

**19. Pay in Lieu of Notice**
It is agreed that the Company may make a payment in lieu of notice to the Employee and ask he or she not to work their notice period although under this Agreement you have no automatic right to receive pay in lieu of notice. The Employee shall not be entitled to any benefit other than a payment in lieu of such benefits in respect of any period for which payment in lieu of notice has been made.

**20. Confidentiality**
For the purposes of this section “confidential information” shall include (without limitation) information concerning any unpublished financial, trading, or operational information, including particulars of, services charging rates, and statistics in relation to:

* the Company,
* any of the Company’s clients or suppliers so far as it has come to your knowledge by reason of your employment.

You will not (except in the proper performance of your job) either during your employment or at any time after its termination for whatever reason:

* disclose any confidential information to any person,
* use such confidential information for your own personal purposes.

You will use your best endeavours to prevent:

* the publication or disclosure of confidential information,
* any misuse of such information.

You must obtain permission in writing from the most senior person in the Company before agreeing to give any lecture, press interview, or to publish any article, which would give details of the Company’s business.

**21. Intellectual Property**
It will be part of your duties to consider how the products, services, processes, equipment, or systems of the Company might be improved, promoted, and marketed.

You acknowledge that all intellectual property rights (including copyright and patents), inventions and other material of any nature made, originated or developed by you at any time in the course of your employment with the Company (whether or not made, originated or developed during normal working hours and whether before or after the date of this Agreement) shall belong to and vest in the Company absolutely to the full extent permitted by law. To the extent that such rights do not vest in the Company automatically, you hold these on trust for the Company.

You agree to provide full written details of any such intellectual property rights, inventions, and other materials to the Company promptly on their creation. You acknowledge that, except as provided by law, no further remuneration or compensation is or may become due to you in respect of your compliance with this clause.

You undertake to provide the Company with every assistance in protecting the Company's intellectual property rights.

**22. Conflict of Interest**
During your employment you will be expected to devote the whole of your working time and attention to the business of the Company and to use your best endeavours to promote the Company's general interest.

If required to do so you must provide details of any relationships with any clients or suppliers of the Company and comply with any reasonable instructions given to you by a Manager on such relationships.

**23. Invalidity & Severability**
All terms contained in this document are governed by the Maritime Labour Convention, 2006. If any court or administrative body of competent jurisdiction shall find any provision of this Agreement invalid or unenforceable, the invalidity or enforceability of such a provision shall not affect the other provisions of this Agreement and all provisions not affected by such invalidity or unenforceability shall remain in full force and effect. The parties agree to attempt to substitute for an invalid or unenforceable provision, a valid or enforceable provision, which achieves to the greatest extent possible the economic, legal, and commercial objectives of the invalid or unenforceable provision.

**24. Other Terms & Conditions of Employment**

Any amendments that materially alter the terms and conditions contained in this Agreement will be notified to you in writing and shall take precedence over the terms in this Agreement.

By signing this Agreement, you understand and confirm acceptance of the terms and conditions as indicated in this Agreement, confirm that you have given sufficient opportunity to examine and seek advice with regard to this Agreement prior signing and confirm that you have been provided with an original signed copy of this Agreement for your records.

**25. Law and Jurisdiction**

This Agreement and all claims or disputes arising under or as a result of it will be governed by and interpreted in accordance with the laws of Guernsey and the Courts of Guernsey shall have exclusive jurisdiction to determine any matters.

**Appendices** The attached appendices will detail any additional contractual information.

This Agreement has been entered into onboard the Carnival Radiance on the 25-09-2023

| **Issued By (Company):** | **Received by (Employee):** |
| --- | --- |
| Harding Brothers (Guernsey) Limited<br>Acting as the Employer and<br>representative of the Ship Owner | Joan Yamilith Sinclair |
| Signed: | Signed: ____________________ |
| Place of Signing: | Date: ____________________ |
| Date: | |

# APPENDIX 1

The following Ships are covered by this Agreement:

| NAME OF SHIP | FLAG OF THE SHIP | NAME OF SHIP | FLAG OF THE SHIP |
|---|---|---|---|
| Arcadia | Bermuda | Seven Seas Mariner | Bahamas |
| Arvia | United Kingdom | Seven Seas Navigator | Bahamas |
| Azura | Bermuda | Seven Seas Voyager | Bahamas |
| Aurora | Bermuda | Seven Seas Explorer | Marshall Islands |
| Britannia | United Kingdom | Seven Seas Splendor | Marshall Islands |
| Iona | United Kingdom | Spirit of Adventure | United Kingdom |
| Ventura | Bermuda | Spirit of Discovery | United Kingdom |
| Carnival Breeze | Panama | Seabourn Encore | Bahamas |
| Carnival Conquest | Panama | Seabourn Odyssey | Bahamas |
| Carnival Elation | Panama | Seabourn Ovation | Bahamas |
| Carnival Glory | Panama | Seabourn Pursuit | Bahamas |
| Carnival Liberty | Panama | Seabourn Quest | Bahamas |
| Carnival Luminosa | Bahamas | Seabourn Sojourn | Bahamas |
| Carnival Mardi Gras | Bahamas | Seabourn Venture | Bahamas |
| Carnival Paradise | Panama | Viking Jupiter | Norway |
| Carnival Radiance | Panama | Viking Mars | Norway |
| Carnival Spirit | Bahamas | Viking Orion | Norway |
| Carnival Splendor | Panama | Viking Neptune | Norway |
| Carnival Valor | Panama | Viking Saturn | Norway |
| Carnival Vista | Panama | Viking Sea | Norway |
| Pacific Adventure | United Kingdom | Viking Sky | Norway |
| Pacific Explorer | United Kingdom | Viking Star | Norway |
| Pacific Encounter | United Kingdom | Viking Venus | Norway |
| Balmoral | Bahamas | Caribbean Princess | Bermuda |
| Bolette | Bahamas | Coral Princess | Bermuda |
| Borealis | Bahamas | Crown Princess | Bermuda |
| Braemar | Bahamas | Diamond Princess | United Kingdom |
| Marina | Marshall Islands | Discovery Princess | Bermuda |
| Regatta | Marshall Islands | Emerald Princess | Bermuda |
| Sirena | Marshall Islands | Enchanted Princess | Bermuda |
| Nautica | Marshall Islands | Grand Princess | Bermuda |
| Insignia | Marshall Islands | Island Princess | Bermuda |
| Riviera | Marshall Islands | Majestic Princess | United Kingdom |
| Vista | Marshall Islands | Regal Princess | Bermuda |
| Fram | Norway | Royal Princess | Bermuda |
| Fridtjof Nansen | Norway | Ruby Princess | Bermuda |
| Maud | Norway | Sapphire Princess | United Kingdom |
| Otto Sverdrup | Norway | Sky Princess | Bermuda |
| Roald Amundsen | Norway | Celestyal Crystal | Malta |
| Marella Explorer | Malta | Celestyal Journey | Bermuda |
| Marella Explorer 2 | Malta | Celestyal Olympia | Malta |
| Marella Discovery 1 | Malta | Norwegian Gem | Bahamas |
| Marella Discovery 2 | Bahamas | Norwegian Jewel | Bahamas |
| Marella Voyager | Malta | Norwegian Prima | Bahamas |
| Queen Elizabeth | Bermuda | Norwegian Spirit | Bahamas |
| Queen Mary II | Bermuda | Norwegian Star | Bahamas |
| Queen Victoria | Bermuda | Norwegian Viva | Bahamas |
| Ambience | Bahamas | | |
| Ambition | Bahamas | | |

# APPENDIX 2
# Medical Insurance Cover

Shipboard Employees will be covered by a medical insurance policy (the premiums of which will be paid for by the Company) from when you leave home on your journey to a ship in preparation for starting your contract until you return home at the end of your contract.

In the event that you require medical treatment (including dental and optical treatment where these are required as a result of an emergency) during this period our appointed medical insurers will be contacted on your behalf prior to treatment taking place and they will advise you of the necessary steps to obtain the treatment that you require and also the method by which the cost of this treatment will be paid.

The extent and level of cover available is as contained within the policy documentation of the insurer. A copy of this cover will have been provided to you at the time you were offered a contract with the Company. Further copies are available on request and a copy is held by the manager on board each ship should you need to refer to it.

Whilst the cover is broad, like all insurance policies there are exclusions that you need to be aware of as follows:

1. Cover specifically excludes claims as a result of journeys:
    a. taken against the advice of a Qualified Medical Practitioner.
    b. where the purpose of the Journey is to receive medical treatment or advice.
    c. where the purpose of the Journey is directly or indirectly related to a medical condition or situation known to exist by the Insured Person.

2. For Journeys that are covered, the insurer shall not be liable for:
    a. expenses incurred as a result of the use by an Insured Person of non-prescribed drugs which cannot be legally obtained from a pharmacy.
    b. expenses incurred as a result of suicide, attempted suicide or self-inflicted injury other than Repatriation Expenses Following Suicide.
    c. any expenses which are recovered from any national insurance programme in connection with any claim.
    d. any expenses incurred 30 days after the time of the incurring of the first expense for the treatment of psychiatric or mental disorders.
    e. any expenses incurred twelve months after:
        i. emergency repatriation to the Country of Domicile in respect of expenses of on- going medical treatment as an in-patient; or
        ii. the time of the incurring of the first expense in respect of other expenses.
    f. treatment which in any way arises from or is attributable to any Human Immunodeficiency Virus infection or related syndrome unless it can be proved to the reasonable satisfaction of the insurer and their medical advisors that this was contracted as a result of a blood transfusion or other medical treatment received for an unrelated injury or illness whilst on a Journey.
    g. loss as a result of the Insured Person being a full-time member of the armed forces of any nation or international authority or a member of any reserve forces called out for permanent service.

3. Pregnancy is not an illness. Any expenses associated with pregnancy are covered if incurred only in an emergency as a result of complications (where such complications are diagnosed by a Qualified Medical Practitioner who specialises in obstetrics).

4. An Employee who requires medical care for injury or illness during the period from the date he/she is entered on the vessel crew list to the date when he/she is repatriated shall, except as otherwise provided herein, be entitled to curative medical treatment (including hospitalization) at the Company's expense until the sick or injured Employee has recovered, or until any sickness or incapacity has been established to be of a permanent nature or until the seafarer is able to claim medical benefits available to him under a scheme of compulsory sickness insurance, accident insurance or other scheme available in his/her country of domicile, whichever comes first.